CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks review of judgments of the Bergen County Board of Taxation affirming the 1988, 1989 and 1990 assessments on plaintiff’s property located at University Plaza Drive, Hackensack, New Jersey (Block 500A, Lot 1). The assessments, the same for all three years, were:
Land $4,664,000
Improvements 8,377,000
Total $13,041,000
At issue are the true value of the subject property and whether plaintiff is entitled to relief from a discriminatory *357 assessment pursuant to N.J.S.A. 54:51A-6 (chapter 123 in the Tax Court). Tax year 1988 was a revaluation year to which chapter 123 is inapplicable, N.J.S.A. 54:51A-6(d), so the court’s finding of true value will be the assessment for that year.
The subject property is a six-story multi-tenanted office building known as One University Plaza; it contains 125,847 square feet of leasable area and is located on 5.51 acres of land. The structure is one of three office buildings in a complex under the same ownership. The other two are known as Two University Plaza and Three University Plaza.
The subject building is of steel frame and prefabricated concrete construction with brick exterior interposed with bands of anodized-metal-encased glass. The building and grounds are well maintained.
When the building was constructed in 1969 the use of asbestos as a fire retardant and insulation material was state-of-the-art. The entire skeletal system of the building was insulated with a sprayed-on asbestos solution which, on the relevant valuation dates, was highly friable. Asbestos permeates the ceiling pans, the duct system, the internal wiring, the masonry surfaces in the plenum (the area between the ceiling pan or deck and the roof) and the support columns throughout the structure. In addition, friable asbestos is present in the elevator shafts, in many areas above the ceiling pans, where plumbing and wiring for electricity, telephones and computers are located.
With the passage of time, asbestos loses its adhesion, dries out, and frequently drops from the pipes, wiring or structural component onto the ceiling pan, thereby scattering micron-size flakes of asbestos throughout the ventilating system.
The additional expense occasioned by the presence of asbestos is incalculable, but substantial. For example, whenever work is done in the plenum, where plumbing, electrical and telephone lines are all located, the asbestos is disturbed, thereby necessitating extensive containment precautions such as respirators, uniforms and special training for the workers. *358 (Electricians and plumbers thus become instant ad hoc environmental technicians.) Moreover, because of the risk of disturbing the asbestos and disseminating it throughout the building by way of the HVAC system, repair work on the plumbing, electrical and telephone systems must be done after normal working hours thus incurring overtime labor rates. Also, air testing and monitoring must occur on an ongoing basis to ensure that the air in the building is acceptable.
In 1987, plaintiffs management embarked upon an extended program of asbestos abatement, notifying all the tenants that the asbestos condition existed and that management decided to do something about it. Management’s plan was to abate space as it became vacant and it was estimated that complete abatement would require ten years.
From July 1, 1988 through September 30, 1988, plaintiff spent $66,064 on its asbestos-abatement program; from October 1, 1988 through September 30, 1989, plaintiff expended the additional sum of $476,511 on the program; and since September 30, 1989, a further expenditure of $98,205 has been made. These abatement payments covered approximately 41,000 square feet of rentable space on the third, fourth and fifth floors. The total amount expended on the abatement program through May 5, 1991 was $640,957.
Much more remains to be spent abating the balance of rentable space and the 14,000 square-foot penthouse structure, which houses the building’s power feeds, emergency generators and HVAC equipment.
Plaintiff’s environmental expert, Adrian Koliba, estimated the remaining cost of the asbestos-abatement program to be $2.9 million, which includes demolition, containment (encapsulation of asbestos), removal of asbestos and its transportation to a disposal site, retrofitting and reinsulation. The estimate of $2.9 million does not include laboratory costs, which account for an additional cost of 15%, or the costs for reinstallation of duct work systems, new ceilings, ceiling tile, new wiring, painting and carpeting.
*359 The presence of asbestos has had a demonstrable effect on lease negotiations with prospective tenants. Two rental agents testified that prospective tenants would not enter into leases in an asbestos-contaminated building at any price. Their position is understandable in view of the high vacancy rates (20% or more) found in office buildings in northern New Jersey on the valuation dates. Some of the existing tenants, while aware of the asbestos problem, renewed their leases but at square foot rates less than the rates contracted for in their original leases. (The rental agents testified that, in their experience, lease renewals are often influenced by the cost and disruption associated with moving to another location. Also, the agents continued, the tenants expressed confidence in management’s determination to solve the asbestos problem.)
The standard lease term in the subject building is five years. Many of the leases confer renewal options, usually for five years. The leases are structured on a gross basis plus tenant electric, tax and operating expense escalations. Contract rental income, inclusive of expense escalation billings, was as follows:
Fisca[1] ¡nded Income Rate/SF
6/30/87 $2,265,243 $18.00
6/30/88 2,460,973 19.56
6/30/89 1,614,806 12.83
6/30/90 1,603,634 12.74
Leases in Two University Plaza, one of the subject’s companion buildings, reflected a similar pattern of increases in contract rents in 1988 over 1987 and a decline in late 1989. Five-year leases executed in 1987 reflect contract rent of $17.50; five-year leases executed in November and December in 1988 reflect contract rents ranging from $16 a square foot to $18.75 a square foot; five-year leases executed in May 1989 disclose rents of $18 a square foot; leases executed in September, October and November 1989 reveal rents of $16.93 a square foot (net of concessions), $17.50 a square foot and $17.75 a square foot. Two University Plaza has no asbestos problem.
*360 Actual vacancies in the subject property and in its companion buildings were as follows:
Third Quarter
1987 1988 1989
One University Plaza 0.9% 28.9% 22.7%
Two University Plaza 8.8% 17.9% 20.2%
Three University Plaza 45.9% 24.3% 16.0%
Office building vacancy rates in Bergen County for the corresponding periods were 23.5% (1987), 20.9% (1988) and 17.8% (1989).
The vacancy rate of 0.9% for the subject property on October 1,1987 is misleading in that it does not reflect the departure on or about October 1, 1987, of a major, high profile tenant (AT & T) which had occupied 32,000 square feet of space on the fourth and fifth floors.
Plaintiffs valuation expert estimated the true value of the subject property to be $8,030,000 on October 1, 1987, $8,010,000 on October 1, 1988 and $8,455,000 on October 1, 1989. In arriving at these conclusions, he relied exclusively upon the discounted cash flow (DCF) method, an aspect of the income approach. He found this method to be especially appropriate for the subject property, because its attainable income and terminal value were affected by the asbestos contamination. Indeed, he opined, the income level over the ten-year asbestos cleanup period was directly related to the progress of the asbestos-abatement program. Hence, he projected economic rents, expenses and vacancy rates over a ten-year span beginning October 1, 1987, applying to each year’s cash flow a present value discount factor at an assumed 12.5% rate. To the sum of these discounted cash flows he added a terminal value, developed by capitalizing the anticipated net operating income *361 in the 11th year at 10.25%, which he then discounted to present value on each assessing date at the assumed discount rate of 12.5%. (The 10.25% capitalization rate included an assumed effective tax rate in the 11th year of 1.5%.)
His discounted cash flow calculations were as follows:
1988
Year Beginning Monthly Present Value Cash Flow Discount Factor (12.5%) Present Value
10/87 1 $ 86,128 11.2255 $ 966,830
10/88 2 45,060 9.9129 446,675
10/89 3 58,790 8.7537 514,630
10/90 4 54,847 7.7302 423,978
10/91 5 50,563 6.8262 345,153
10/92 6 45,948 6.0281 244,586
10/93 7 45,181 5.3231 240,503
10/94 8 46,867 4.7007 220,308
10/95 9 52,062 4.1511 216,115
10/96 10 57,100 3.6656 209,306
Terminal Value* 13,650,000 0.3079 4,202,835
Total Present Value (10/1/87) (rounded) $ 8,030,000
Expenses (excluding real estate tax) -712,295
Net Operating Income $ 1,399,520
Capitalized at 10.25 (including assumed effective tax rate of 1.50%) $13,650,000
(rounded)
1989
Year Beginning Monthly Present Value Cash Flow Discount Factor (12.5%) Present Value
10/88 1 $ 45,060 11.2255 $ 505,821
10/89 2 58,790 9.9129 582,779
10/90 3 54,847 8.7537 480,114
10/91 4 50,563 7.7302 390,862
10/92 5 45,948 6.8262 313,650
10/93 6 45,181 6.0281 278,384
10/94 7 46,867 5.3231 249,478
10/95 8 52,062 4.7007 244,728
10/96 9 57,100 4.1511 237,028
Terminal Value $13,650,000 0.3464 $ 4,728,360
Total Present Value (10/1/88) (rounded) $ 8,010,000
*362 1990
Year Beginning Monthly Cash Flow Present Value Discount Factor (12.5%) Present Value
10/89 1 $ 58,790 11.2255 $ 659,947
10/90 2 54,847 9.9129 543,693
10/91 3 50,563 8.7537 442,613
10/92 4 45,948 7.7302 355,187
10/93 5 45,185 6.8262 308,415
10/94 6 46,867 6.0281 282,519
10/95 7 52,062 5.3231 277,131
10/96 8 57,100 4.7007 268,410
Terminal Value 13,650,000 0.3897 5,319,405
Total Present Value (10/1/89) (rounded) $ 8,455,000
The expert projected economic rent levels and vacancy rates for the same 11-year period as follows:
Economic
Rent ($/SF/Yr) Year Starting Percentage Change Vacancy
1 10/87 $17.50 20%
2 10/88 17.00 -2.9% 20%
3 10/89 16.50 -3.0% 20%
4 10/90 16.00 -3.1% 20%
5 10/91 16.00 20%
6 10/92 16.00 20%
7 10/93 16.40 +2.5% 17.5%
8 10/94 16.80 +2.5% 15%
9 10/95 17.25 +2.5% 12.5%
10 10/96 17.65 +2.5% 10%
11 10/97 18.10 +2.5% 5%
He stabilized expenses of $504,960 (excluding real estate tax) for the year beginning October 1, 1987, then increased them by 3.5% a year thereafter for the balance of the projection period. In addition, he imputed asbestos-abatement costs over the projection period at $2,250,000, assigning $66,064 to the first year (the year beginning October 1, 1987), $418,512 to the second year, with the balance spread evenly over the remainder *363 of the projection period at the annual rate of $220,625. He then added refitting costs of $9.25 a square foot for the first year, which he trended upward at 3.5% per annum thereafter, and brokerage commissions which he imputed at 4% of aggregate rents, based on five-year leases.
While the expert recognized that real estate tax is normally excluded as a line-item expense in tax valuation cases, he felt that the DCF method required charging of all operating expenses. Thus he imputed real estate at $1.25 a square foot of gross building area for the first year and trended that figure upward at an annual rate of 1.5% for the balance of the projection period.
The evidence indicates that of 125,847 square feet of leasable area, 13,642 square feet (10.7%) were leased to dates in 1994, 6,857 square feet (5.4%) were leased to dates in 1995 and 15,467 square feet (one lease) (12.29%) were leased to a date in 1998. One other lease, for 11,032 square feet (less than 10% of the total leasable area) extended to a date in 1993. The balance of the leases expired no later than 1992.
Defendant’s valuation expert estimated the subject property’s true value at $15,000,000 for 1988, $14,300,000 for 1989 and $13,500,000 for 1990. In arriving at these estimates he relied upon the income and market data approaches, giving greater weight to the former. Unlike his opposite number he utilized the conventional direct capitalization approach and ascribed no significance to the presence of asbestos. His income approach may be summarized as follows:
1988
Economic rent—$18/SF X 132,120 SF $2,378,160
Less 5% vacancy and loss allowance 118,908
Effective gross income $2,259,252
Less expenses:
Management—3.5% $ 79,074
Utilities 118,636
Water 13,396
*364 Insurance $ 39,636
Repairs, maintenance and janitorial 132,876
Replacement reserve—1% 22,592
Salaries 64,194 $ 492,996
Net operating income $1,766,256
He capitalized net operating income at 11.87%, including the actual tax rate of 1.87%, utilizing the band of investment mortgage-equity technique:
75% mortgage—25 years @ 10.5% interest, constant 11.33% 8.5%
25% equity dividend @ 6% 1.5%
Tax rate (100%) 1.87%
11.87%
Application of this capitalization rate to the aforesaid net operating income of $1,766,256 produced a value estimate of $14,880,000 (rounded).
1989
Economic rent—$17.50/SF X 132,120 SF $2,312,100
Less 5% vacancy of loss allowance 115,605
Effective gross income $2,196,495
Less expenses:
Management—3.5% $ 76,877
Utilities 120,000
Water 10,000
Insurance 39,636
Repairs and maintenance—6% 131,790
Miscellaneous—1% 21,965
Salaries 85,000
Replacement reserve—1% 21,965 507,233
Net operating income $1,689,262
*365 He capitalized net operating income at 11.89%, which included an effective tax rate of 1.89% ($2.12 actual X average ratio of 88.96%). The components of the capitalization rate were otherwise identical to 1988. The application of the capitalization rate of 11.89% to the aforestated net operating income resulted in a value estimate of $14,200,000 (rounded).
1990
The expert estimated economic rent to be $17 a square foot. He posited the same vacancy and loss rate of 5%; expenses totalled $524,779, the major change from the prior year was in the utilities expense. All other expenses were substantially the same, either in dollar amounts or as a percentage of effective gross income. The net operating income was $1,608,959, which he capitalized at 12.05%, including an effective tax rate of 2.05% ($2.39 actual X average ratio of 85.79%) to arrive at a value estimate of $13,385,000 (rounded).
The expert’s estimate of $18 a square foot as economic rent for tax year 1988 was based upon 17 leases in the subject and ten leases in office buildings in nearby communities. None of the leases outside the subject was in buildings contaminated by asbestos. Of the 17 leases in the subject, all but five were executed before 1987, the year the asbestos condition was disclosed to the tenants.
The expert’s estimate of $17.50 a square foot and $17 a square foot as economic rent for 1989 and 1990, respectively, was based upon 25 office building leases, 12 in the subject, 13 in Two University Plaza. The latter, as previously noted, was not contaminated by asbestos.
The expert’s true value estimate under the sales comparison approach was the same for all three years, namely, $15,855,000 or $120 a square foot, land and building merged. He relied upon four office building sales for his 1988 value estimate and six office building sales for his 1989 and 1990 value estimates. The ten sale properties are located in Lyndhurst, Rutherford, *366 Eidgewood, Englewood, Woodcliff Lake, Eamsey, Paramus and Fort Lee. None of the sale properties was contaminated with asbestos.
While all the comparable sale properties were office buildings no income and expense information was provided with respect to any of them. The sales occurred between December 19,1986 and January 1990 for prices ranging from $110.91 a square foot to $184.09 a square foot; five of the sales ranged in price from $133.20 a square foot to $136.98 a square foot.
 The sales comparison approach can be disposed of summarily. The comparable sales utilized by defendant’s expert are not probative of the subject’s true value. Not one of the sale properties was contaminated with asbestos a condition which I find has a significant effect on value. Also, no income and expense evidence with respect to the sale properties was offered. Without such evidence it is impossible to ascertain what interests were conveyed by the sales. If the leases were not current and thus not reflective of economic rent, the sales were of the landlord’s interest only, not of the fee simple estate in the sale properties. Evidence of comparable sales is effective in determining value of property for tax purposes only where there is a substantial similarity between the sale properties and the subject so as to admit of a reasonable comparison. Venino v. Carlstadt Boro., 1 N.J.Tax 172 (Tax Ct.1980), aff’d o.b. per curiam 4 N.J.Tax 528 (App.Div.1981).
In any event, the income approach is the predominant method for determining the value of income properties. Helmsley v. Fort Lee, 78 N.J. 200, 394 A.2d 65 (1978), app. dism. 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979); Fort Lee v. Hudson Terrace Apts., 175 N.J.Super. 221, 417 A.2d 1124 (App.Div.1980).
The DCF method is an assumption-laden approach to estimating the present value of future benefits. It presupposes a *367 measure of reliability in the projection of cash flows over a significant span of years. It also assumes the reasonable accuracy of vacancy rates, expenses, the discounted value of the reversion at the end of the projection period, the capitalization rate applied to the reversion in the first instance and, finally, the discount rate assigned both to the cash flow projections and the reversion. Plaintiff’s expert has attenuated his assumptions still further not only by projecting rental income beyond the expiration dates of the leases in place on the valuation dates but also by refining contract rents according to whether leases were in place or space was leased to new tenants or to old tenants under renewals. Only one of the leases in place on the valuation dates extends as far as the expert’s ten-year projection period. As stated above, 10.7% of the leasable area was leased to 1994, three years before the end of the projection period and only 5.4% of the leasable area was leased to 1995, two years before the end of the projection period.
Estimates of anticipated future rent and expenses must be based on reasonably clear and appropriate evidence. Guide Note 4, “Discounted Cash Flow Analysis as a Valuation Method,” Standards of Professional Appraisal Practice (1991). As only a small percentage of leases prevailing on the valuation dates can be projected for as long as five years, and none for as long as ten years, the reasonably clear and appropriate evidence is lacking.
As one distinguished commentator has declared:
Although DCF analysis has been misunderstood and unfairly criticized, there is nevertheless a tendency to attach undue weight to the results. Perhaps this is because the neatly printed computer printouts give the appearance of accuracy and proof. In reality, the results of DCF analysis can be no more accurate then the appraiser’s input. Because countless different combinations of numbers representing rates, time, and cash flow in the equation of value can point to the same final value, it is difficult to imagine that any single combination of numbers could serve as proof of value. DCF analysis as used in the appraisal process should therefore be viewed as simply another means of estimating and explaining value from an investor’s point of view, but DCF *368 analysis should not be viewed as a means of refining or proving value. [Akerson, “Appraising the Market,” Banker & Tradesman, (October 30, 1991); emphasis supplied].
The DCF method, as applied to tax valuation proceedings, is an amalgam of interdependent, attenuated assumptions of limited probative value. Whatever may be its utility in other contexts, its use in this case can only be described as an exercise in financial haruspication. Kearny Leasing Corp. v. Kearny, 6 N.J.Tax 363, 381 (Tax Ct.1984), aff'd o.b. per curiam 7 N.J.Tax 665 (App.Div.1985).
In view of the foregoing the court accepts the direct capitalization approach utilized by defendant’s expert.
In determining economic rent and vacancy allowances the court has considered the impact of asbestos contamination on both rents and vacancies. The credible testimony of the rental agents indicates that prospective tenants simply will not lease asbestos-contaminated space. Existing tenants, the agents continued, will not renew their leases in the absence of a clearly demonstrated commitment by the landlord to a long-range program of complete asbestos abatement.
The evidence also indicates the effect of the asbestos condition on vacancies, which are higher in the subject than in its companion buildings and in the generality of office buildings in northern New Jersey during the years under review.
The court has also considered the prospect that, during the useful economic life of the subject building, the asbestos condition will be fully abated, at which point rents will probably increase and vacancies decline.
Thus, a finding of economic rent necessarily involves consideration of factors beyond the contract rents prevailing on the valuation dates.
In view of the foregoing, and after weighing and considering all the factors mentioned, the court finds the economic rent to be $18 a square foot for 1988, $17.50 a square foot for 1989 and $17 a square foot for 1990.
*369 The vacancy allowance is more troublesome. Its determination involves more than uncritical acceptance of the vacancy rates prevailing in the subject on the valuation dates or, for that matter, the office building vacancy rates prevailing in the subject’s market area. Rather, a vacancy allowance must be predicated on an estimate of the long-term quality and durability of the rental income stream. Newark v. 1013 Corp., 1 N.J.Tax 107 (Tax Ct.1980). In this case, arriving at that estimate, which is never easy, is rendered even more difficult by the impact of asbestos. As indicated above in the findings of fact, plaintiff’s expert predicted vacancy rates, over a ten-year period, starting at 20%, dropping to 17.5% after six years, then continuing to decline until the end of the ten-year period, when he predicted a 5% vacancy rate. His predictions appear to bear a direct relation to the progress of plaintiff’s asbestos abatement program.
Stability of assessment -is an important desideratum in tax valuation cases. See New Brunswick v. Tax Appeals Div., 39 N.J. 537, 550, 189 A.2d 702 (1963); Inwood at Great Notch v. Little Falls Tp., 6 N.J.Tax 316, 332 (Tax Ct.1984). In applying that policy I find the appropriate vacancy and loss allowance for all years under review to be 9%, the approximate average of the vacancy rates projected by plaintiff’s expert over a ten-year span, plus the vacancy rate (5%) estimated over the then remaining life of the building.[1]
In arriving at these conclusions the court, within the confines of the record, has applied its own expertise in property taxation. While the opinions of the experts are weighed and considered, this court is not bound to accept them. See Glen Wall Associates v. Wall Tp., 99 N.J. 265, 280, 491 A.2d 1247 (1985).
*370 Except for the expense of asbestos containment, the experts differ insubstantially in their expense estimates. The evidence indicates that the presence of asbestos adds to maintenance costs.
For that reason, the court finds the expenses, exclusive of management and replacement reserves, to be $410,575 for tax year 1988, $424,945 for 1989 and $439,315 for 1990, all as posited by plaintiff's expert. I find that reasonable allowances for management and replacement reserves are 4% of effective gross income and 1% of effective gross income, respectively.
The parties disagree on the impact of asbestos on the subject’s true value. Plaintiff contends that the presence of asbestos has a significant effect upon value; defendant argues that it has no effect whatever.
Property must be valued for tax purposes in the actual condition in which the owner holds it. Hackensack Water Co. v. Old Tappan Boro., 77 N.J. 208, 390 A.2d 122 (1978). The condition in this case is asbestos contamination. No investor would purchase the subject property without taking into account the impact of the asbestos-abatement program. Thus, the capitalized value as hereinafter calculated will be reduced by the remaining cost to cure the asbestos problem.
In arriving at the conclusions herein stated regarding the impact on value of asbestos contamination the court has taken into account the principles set forth in Inmar Associates, Inc. v. Carlstadt, 112 N.J. 593, 549 A.2d 38 (1988), a case involving the effect on value of toxic-waste contamination and the regulatory restrictions on sale of property so contaminated. The discursive opinion of the Supreme Court must be read in the context of governmental prohibitions on the sale of property contaminated with toxic wastes. No such restrictions apply to asbestos contaminated property; indeed the Court’s observation that the cost of cleanup did not result in a dollar-for-dollar reduction in value was predicated upon the absence of “regulatory neutrality.” Id. at 602, 549 A.2d 38. That neutrality *371 exists in the instant case. There are no governmental restrictions on the sale of property contaminated by asbestos.
Hence, this court is at liberty “to exercise its power ... to use the information available to it to make an independent determination of value.” Id. at 609, 549 A.2d 38.
The assumptions underlying the capitalization rate of 10.25% (including real estate taxes) of plaintiffs expert are not appropriate as they presuppose a value at the conclusion of the asbestos-eradication program some ten years hence. The expert’s capitalization rate thus derived, premised as it is upon the DCF methodology which the court rejects, does not assist the court in determining the capitalized true value of the subject on the relevant valuation dates.
Thus, the evidence preponderates in favor of the capitalization rates postulated by defendant’s expert, subject to the adjustment to reflect the cost of asbestos abatement.
In view of the foregoing the court finds the true value of the subject property to be $9,039,800 on October 1, 1987 (for tax year 1988), $8,838,700 on October 1, 1988 (for tax year 1989) and $8,502,900 on October 1, 1989 (for tax year 1990), all calculated as follows:
1988
Gross potential income—125,847 SF @$ 18/SF $2,265,246
Vacancy and loss allowance—9% 203,872
Effective gross income $ 2,061,374
Expenses (including 4% management, 1% replacement reserve) 513,644
Net operating income $ 1,547,730
Capitalized at 11.87% (including effective tax rate of 1.87%) $13,039,000 (rounded)
Less cost of asbestos abatement 4,000,000
True value $ 9,039,000
*372 1989
Gross potential income—125,847 SF @ $17.50/SF $ 2,202,322
Vacancy and loss allowance—9% 198,209
Effective gross income $ 2,004,113
Expenses (including 4% management, and 1% replacement reserve) 525,150
Net operating income $ 1,478,963
Capitalized at 11.89% (including effective tax rate of 1.89%) 12,438,713
Less cost of asbestos abatement 3,600,000
True value $ 8,838,700
(rounded)
1990
Gross potential income—125,847 SF @$17/SF $ 2,139,400
Vacancy and loss allowance—9% 192,546
Effective gross income $ 1,946,854
Expenses (including 4% management and 1% replacement reserve) 536,658
Net operating income $ 1,410,196
Capitalized at 12.05% (including effective tax rate of 2.05%) 11,702,871
Less cost of asbestos abatement 3,200,000
True value $ 8,502,900
(rounded)
The assessment exceeds the true value herein found for all three years under review.
Tax year 1988 was a revaluation year to which chapter 123 is expressly inapplicable, so the assessment for that year will be 100% of the true value of $9,039,000.
*373 The assessments for 1989 and 1990 will be determined by application of the Director’s average ratio (88.96% for 1989, 85.79% for 1990) to the true value as found for those two years. N.J.S.A. 54:51A-6(b).
I direct that judgment be entered indicating the assessments to be as follows:
1988
Land $3,163,600
Improvements 5,875,400
Total $9,039,000
1989
Land $2,752,000
Improvements 5,110,900
Total $7,862,900
1990
Land $2,553,100
Improvements 4,741,500
Total $7,294,600

Calculated as follows: Effective gross income year beginning 10/1/97 $ 2,111,815

The evidence of the building’s solid, durable construction justifies a finding that the economic life of the building, assuming continued good maintenance, is 40 years on the earliest assessing date.