KAHN, J.T.C.
This is the court’s determination with respect to a real estate property tax appeal covering three years: 1993, 1994 and 1995. The assessments for each of the three years are as follows:
Land $6,226,500
Improvements 4,898,700
Total $11,125,200
The year 1993 (assessment date October 1, 1992) is a revaluation year. The chapter 123 ratio for 1994 (assessment date October 1, 1993) is 90.25%; for 1995 (assessment date October 1, 1994) the ratio is 89.46%. N.J.S.A. 54:51A-6.
The property in question is the Tamcrest Country Club, and involves 35.58 acres of land located in the Borough of Cresskill, known as Block 91, Lot 3, upon which exists a nine-hole golf *632 course, a two-story clubhouse (43,326 s.f.) aiid several accessory buildings (pro shop, utility building, garage) along with a swimming pool and three tennis courts. There is also significant paving for interior utility roads and parking. Tamcrest also includes approximately 18.58 acres located in Alpine (not under appeal in this case) which includes a portion of the golf course and parking area.
The clubhouse has two main uses. The upper level is utilized primarily as a catering facility provided for weddings, Bar/Bat Mitzvahs and various other organizational banquets. While some Tamcrest Country Club members use the catering facility, most bookings are to nonmember customers. The upstairs portion also contains some office space utilized for both the country club and the catering business. In the downstairs portion there is a restaurant utilized primarily for club members; however, that room is also occasionally utilized for catering. Downstairs there are also men’s and women’s locker rooms and a bar generally utilized by club members.
The improvements were first constructed in and around 1969 with some renovations being made in 1981 and 1985.
The zoning ordinance in effect at the time Tamcrest was constructed essentially provided for a one-family residential zone permitting one-family detached dwellings on lots with a minimum area of 40,000 sq. ft. (R-20). The zoning ordinance, as amended, included private membership golf clubs with facilities such as golf courses, tennis courts, swimming pool, auxiliary buildings, restaurants, bars, etc. This ordinance was subsequently amended prior to the relevant assessment dates, specifically eliminating the provision permitting construction of a golf course. One-family residences became the only permitted use.
The subject property is one of three golf clubs that were developed on property owned by the Tamburelli estate. Up to the mid-1980s all three country clubs were in existence: the subject (Tamcrest), Tammy Brook Country Club, and Montammy Country Club. Most or all of the land of these properties was contained in the Borough of Cresskill. The Tammy Brook Country Club *633 property is situate to the immediate west of the subject. Montam-my Country Club is situate immediately north and east, thereby being the closest of the three clubs to Route 9W. The entrance to Tammy Brook Country Club was through local streets in Cresskill from the westerly edge of Tammy Brook. The entrance to Montammy and Tamcrest is only from Route 9W by an access road which first passes in front of Montammy and ultimately reaches Tamcrest, approximately one quarter of a mile from Route 9W.
In and around 1987, the Tammy Brook property, which had formerly been operated as an eighteen-hole golf course and country club, was sold to a developer. The club had consisted of the golf course, along with a swimming pool, tennis courts, and club house catering building. The property was subdivided into approximately 100 one-family lots which were sold between 1988 and 1995. The site plan approval apparently did not require the demolition of the catering building. Within a year or two thereafter, however, the catering building was demolished.
Currently Tamcrest functions as a golf, swimming, and tennis country club with annual memberships renewable by agreement. Montammy Country Club also is utilized as an eighteen-hole golf course with similar facilities, except that the club is member owned.
The facts relating to the history of the Tammy Brook Country Club will be hereinafter discussed in this opinion and may be referred to as the “Tammy Brook experience.” Both parties relied upon certain facts and circumstances concerning Tammy Brook.
The taxpayer contends that the property should be valued as a going business and offers the current lease between the property owners and the current operators of the business as evidence of value through an income capitalization approach. In the alternative, the taxpayer contends that the highest and best use of the property would be a subdivision of the entire property into one-family lots. Taxpayer utilizes a discounted cash flow analysis to obtain the present value of the property, which value would be *634 realized over a five year period. This subdivision or anticipated use method anticipates that an investor would need to provide funds to obtain permits, engineering work, and site work to make the property ready for marketing, followed by a period of time to sell the lots.[1] These expenses are often referred to as direct and indirect costs.
The municipality contends that the highest and best use of the subject property is to develop approximately 30.00 acres into 24 one-family home lots for resale and to utilize 5.58 acres to retain the clubhouse building and catering business. The municipality further contends that the cost approach should be utilized to value the building and a market sales analysis should be used to analyze the value of the land upon which the building is situate. The municipality also contends that the 24 one-family home lots (30.00 acres) should be valued by a discounted cash flow analysis. Taxpayer’s initial approach results in a value estimate of $3,000,000, while the municipality urges $11,768,000.
The parties, at the outset of the trial, agreed and stipulated that the finished residential lots would have a value of $455,000 per lot which eases the court’s[1] determination.
WHETHER OR NOT THE CATERING BUILDING MAY CONTINUE AS A PERMITTED USE.
The taxpayer contends most significantly that by the elimination of the golf course (which both parties recommend), the catering building would not be a legally permitted use and, therefore, the municipality’s analysis must be rejected. If taxpayer is correct, then the municipality also urges that the highest and best use of the subject property is for development of one-family residential lots to be valued by the subdivision/discounted cash flow method.
*635 Taxpayer looks to the initial ordinance which permitted the construction and erection of the golf course and catering building. Taxpayer argues that currently the existing golf course and catering building together would be a legal non-conforming use, but that removal of the golf course would change the character of the use so as to convert the building into a nonlegal use. Reference is made to the language of Ordinance 474 which permits the clubhouse building as an accessory use to the golf course:
1) Annual private membership golf clubs catering primarily to members and their guests, subject to the following provisions:
a) Facilities and Uses: Such dubs may provide such facilities as golf courses, tennis courts and swimming pools and auxiliary buildings, restaurants, bars and similar facilities accessory thereto.
2) The minimum lot size shall be 100 acres and no building or structure shall be located nearer than 200 feet to any public street or property line.
This Ordinance No. 474 clearly does not permit the building without the golf course. A use variance would have been required to obtain the building permit for the building in the absence of the golf course.
The municipality relies upon the “Tammy Brook experience.” In 1987-1988 the purchaser of the Tammy Brook property received site plan approval for approximately 100 one-family home lots and apparently the right to continue the catering building. Based upon this, the municipality asserted that the municipality would now likewise permit the subject catering building to continue in the absence of the golf course. The municipality also relies upon off-the-record statements allegedly made by certain Cresskill officials that they would favor the retention of the catering building. This court, however, feels that the greater weight of reliable evidence indicates that it is not likely that the catering building and use therein would be permitted to continue.
In the first place, the removal of the golf course creates a building that would not have been permitted pursuant to Ordinance No. 474 at the time of its erection without a use variance. The stated purpose of that building within the ordinance was clearly to be an accessory to a golf club as a place to eat, drink, and socialize, which is obviously necessary to such a club. Cer *636 tainly the catering building is not a necessary appurtenance to a subdivision of one-family homes. ■ While technically the elimination of the golf course reduces the gross size of the non-conforming acreage, the actual nonconformity is greater because the catering building is greater in its nonconformity to the proposed surrounding area of new one-family homes.
The courts have strictly construed the continuation of a nonconforming use. Essentially, little change in such use is permitted. There is no question that expansion of a nonconforming use is prohibited. Ranney v. Istituto Pontificio Delle Maestre Filippi-ni, 20 N.J. 189 (1955). See also, Town of Belleville v. Parrillo’s, Inc. 83 N.J. 309 (1980).
Although a property owner may make a negligible or unsubstantial change in a nonconforming use without a use variance,
(w)here there is doubt as to whether enlargement or change is substantial rather than insubstantial, the courts have consistently declared that it is to be resolved against the enlargement or change.
Id. at 316,416 A.2d 388.
In Razberry’s, Inc. v. Kingwood Tp. Planning Bd., 250 N.J.Super. 324, 593 A.2d 1264 (App.Div.1991), the Appellate Division found that a decrease in the size of property containing a nonconforming use (from eight plus acres to only three acres) might still require a use variance for the continuation of that use. Id. at 328, 593 A.2d 1264. The court held that the reduction in size of property lessened the buffers between the conforming and nonconforming uses thereby intensifying the nonconforming use.
If the property owner seeks to retain the use of the catering building, he is faced with a situation clearly analogous to that described in Razberry’s.. The elimination of the golf course creates two problems. In the first place, the right to erect the clubhouse building exists only by reason of its use in conjunction with a golf course as specifically set forth under the terms of the then existing zoning ordinance. Removal of the golf course creates a building not otherwise permitted under said ordinance.
Secondly, the removal of the golf course creates a smaller lot for the building, lessening the buffers between the building and the *637 surrounding one-family homes and creating a situation clearly identical to the facts presented in Razberry’s.
This court concludes that a use variance would be required in order to continue the existence of the building and its current use.
The municipality contends that in the event a variance would be required, same would be granted and, therefore, the building and catering business would be permitted to continue. In support of this contention, the municipality proffers:
(a) conversations between its appraiser and several municipal officials indicating an interest in retaining the catering business; and
(b) the contention that the Tammy Brook experience in and around 1987 was similar and that the municipality in that instance apparently permitted the continuation of a catering building as part of its subdivision approval for 100 homes.
This court rejects the municipality’s contention and finds that consideration of municipal approvals in this case is too speculative and uncertain to permit valuation of the subject property by including the catering building as it is currently utilized.
First, the conversations between the municipality’s appraisal expert and several municipal officials were clearly nonbinding and off-the-record. The formal variance procedure requires notice to neighboring land owners, at least one public hearing, and consideration on the record by either the zoning or planning board at a public meeting. These off-the-record conversations are unreliable as evidence that a variance would be granted.
Second, approvals granted to Tammy Brook developers in 1987 and 1988 are not transferable to Tamcrest and not precedent upon which Tamcrest may rely. That municipal action took place almost ten years ago. There is no evidence that the members of the relevant municipal agencies between October 1, 1992 and October 1,1994 (subject assessment dates) were the same as were those deliberating on the Tammy Brook site plan. No right would be conferred upon the taxpayer if the variance application was applied for merely by reason of the fact that in 1987 or thereabout a similar project was approved for another developer. The record in this case does not indicate whether or not a variance was *638 applied for and approved in order to permit the continuation of the catering building with respect to the Tammy Brook development.
The record does demonstrate that not long after site plan approval for the Tammy Brook building, the developer began marketing and selling the homesites. In evidence is one contract which required the demolition of the catering building as a condition of sale. Taxpayer’s expert witness testified that his investigation revealed eighteen other contracts with a similar condition. While the other eighteen contracts were not produced at this trial, this court finds the testimony credible and reliable. No testimony or evidence was produced by the municipality to demonstrate what effect the continuation of the catering building if approved would have on the valuation of the lots, especially those closest to the buffer area.
The Supreme Court of New Jersey in State by Com’r of Transp. v. Caoili, 135 N.J. 252, 639 A.2d 275 (1994) (a condemnation case), considered the establishment of the highest and best use of property in light of zoning restrictions. The court in referring to its opinion in State v. Gorga, 26 N.J. 113, 138 A.2d 833 (1958) reestablished a two-step approach dealing with zoning restrictions:
The Court therefore imposed, in effect, a two-step standard governing the consideration of evidence of zoning changes affecting the future use of property. It established one standard for the admissibility and another for the substantive consideration of such evidence. It stated: “if as of the date of taking there is a reasonable probability of a change in the zoning ordinance in the near future, the influence of that circumstance upon the market value as of that date may be shown,” but that before allowing a jury to consider the issue, the trial court should first decide whether the record contains sufficient evidence of a probability of a zoning change to warrant consideration by the jury.
Id. at 116-17.
This court finds that admissibility of the evidence promoting a zoning change is not the issue. This court permitted the statements made by the municipality’s appraiser as to conversations from third parties and further admitted evidence concerning the Tammy Brook experience. Clearly, the municipality has failed to demonstrate a reasonable probability that the use would be permitted. Thus, pursuant to Ford Motor Co. v. Edison Tp., 10 N.J.Tax 153 (Tax 1988) aff'd o.b. per curiam 12 N.J.Tax 244 *639 (App.Div.1990), aff'd 127 N.J. 290, 604 A.2d 580 (1992), the first element of the highest and best use test (whether a proposed use is legally permissible) was not proven. Moreover, recognizing that there would be at least a question concerning granting of such permission, the municipality likewise failed to produce any evidence of the effect a zoning change contingency would have upon the value of all or any of the proposed one-family lots.

THE MUNICIPALITY’S VALUATION METHODOLOGY FOR THE CATERING BUILDING AND LAND THEREUNDER.

Although this court finds that the catering building would not legally be permitted to remain, it is necessary to review the municipality’s valuation methodology for the building and land thereunder. For the 5.58 acres under the building, the municipality utilized a comparable sales approach involving three sales of purportedly comparable land upon which structures were built which are allegedly comparable to the subject. Sale No. 1 was located on Market Street in Elmwood Park consisting of 2.36 acres; Sale No. 2 was located on Kinderkamack Road in River Edge consisting of 1.51 acres; and Sale No. 3 was located on Old Hook Road in Westwood consisting of 1.02 acres. All three of these properties have frontage on main business/commercial thoroughfares in their respective communities. The improvements constructed on the three comparable properties consisted of a retail building, a commercial building, and a medical building, all fronting the aforementioned business arteries, and therefore all visible to traffic. In addition, the sizes of the comparables are so significantly less than the subject (5.58 acres), that adjustment is unreliable. The subject parcel is located approximately j4 mile west of Route 9W, not visible to Route 9W traffic. No other access exists. There was no evidence that Route 9W traffic passes by any similar commercial building other than major office buildings in which people work on a daily basis. There is absolutely no similarity or comparability between the subject location, use and size as compared with the purported comparable sales.
*640 The municipality’s cost approach also fails. This court does not take issue with the witness’s analysis of the replacement cost factors through the Marshall Valuation Service Manual, of the estimated seventeen percent physical depreciation. The municipality’s expert witness’s estimate of ten percent functional obsolescence is unrealistic as indicated by his own testimony. The witness acknowledged on cross-examination that a significant means of testing his analysis would be the use of the income approach to gauge the extent of the difference in valuation between the two approaches. He acknowledged also that the difference between the results (acknowledging the cost approach to be higher) should crystallize the extent of functional obsolescence.
The witness admitted that he neither attempted to obtain information as to comparable leases of similar properties, nor did he analyze the lease between the current owner of the property and the operator of same. Taxpayer’s appraisal expert had already testified that the lease was entered into for a twenty-five-year period beginning January 1, 1980, and terminating in 2004. A history of that lease shows various increases which produce current leasehold income to the owner in the amount of approximately $280,000 per year. The municipality’s expert concluded by the market data approach for the land and the cost approach for the building, that the value of the building and the accompanying land total $5,900,000. Utilizing a ten percent rate (equivalent to the rate utilized by the municipality’s witness as a discount rate in his discounted cash flow analysis), the income needed to produce a value of $5,900,000 would necessarily be at least $590,000. The witness further acknowledged that there is reliable evidence that the owner at most earns a total income of $280,000, which if capitalized at the same ten percent, would produce a value of $2,800,000 for the catering building and land. While the municipality’s expert witness did not stipulate that the $280,000 of rental income is necessarily market rent, he acknowledged that if, in fact, it was market rent (it being the only evidence of market rent), the difference between the income approach value and the cost approach value exhibits a significant difference, attributed to func *641 tional obsolescence, in an amount far greater than his ten percent estimate, in fact closer to forty-five percent.
The municipality’s expert witness also did not even consider that the question of whether or not the continuation of the catering building by municipal action would have an effect on a negotiated purchase price for the property. Our courts require that such analysis be made. West Orange v. Goldman’s Estate, 2 N.J.Tax 582 (Tax 1981); see also State v. Gorga, supra. There is no question that a prospective purchaser would seriously consider the extent of permitted uses in negotiating a purchase price for the subject property. The municipality’s expert witness also failed to consider that one-family lots located proximate to the buffer of a nonconforming use may not sell for the same price as lots further removed from the building. Although the parties stipulated to a price per finished lot, it was incumbent upon the municipality’s appraisal team to at least analyze the issue. The Tammy Brook experience upon which the municipality relies so heavily demonstrates, contrary to the municipality’s analysis, that purchasers of one-family lots were concerned enough with the effect of the building upon the value of certain lots to require demolition as a condition of purchase.
This court finds that, aside from the legal question of whether the catering building would be permitted with respect to the zoning ordinance, the municipality’s appraisal expert’s valuation analysis of the building and land thereunder is insufficient for this court to determine value, even considering the authority conferred upon this court by Glen Wall Associates v. Wall Tp, 99 N.J. 265, 280, 491 A.2d 1247 (1985).

TAXPAYER’S INCOME CAPITALIZATION APPROACH

The subject property, as of the relevant assessment dates, has been under a long term lease between the property owner and the operator of the golf club and catering facility. As hereinabove set forth, the lease commenced in 1980 for a period of twenty-five years through 2004. There is no dispute that the lease contained increases as set forth in the lease and the history of the relation *642 ship between the parties to the lease demonstrates other modifications over a period of time.
The initial rent in 1980 was $115,000 per year and, in fact, by reason of said changes, the actual rent paid in 1993 was $275,236 and in 1994, $280,741.
The taxpayer’s appraisal expert found no comparable leases to compare with the subject for analysis of market rent. His analysis was solely based upon a comparison of the rental history with changes in the chapter 123 ratios over the years in question. His analysis, forming part of the appraisal report, viewed each annual change in the chapter 123 ratio as it compares with the changes required by the lease. He concluded that based upon the changes in the chapter 123 ratio, N.J.S.A. 54:l-35a, every $100 of rent in 1980 would have been negotiated at $215.95 in 1993-1994 based upon market forces. In short, this analysis indicated that the rent actually paid in 1993 and 1994 would have been paid by willing participants if currently negotiated.
Using gross income of $280,000, less a five percent vacancy allowance, and five percent of effective gross income for reserves and management, the taxpayer’s witness indicates a net operating income of $252,700. Capitalized at ten percent, his indicated value by this methodology is $2,527,000.
This court finds that taxpayer’s income capitalization methodology contains insufficient reliability as an independent method of valuation, mainly because there is no other evidence derived from the marketplace (or from anywhere else) to test the subject lease as economic rent.
The discounted cash flow analysis approach used by both the taxpayer’s and the municipality’s appraisal experts does indicate a higher value as developed for one-family homes which leads this court to conclude that the highest and best use of the subject property is for one-family home development. Accordingly, no weight shall be given by this court to the income capitalization approach as an independent source of determining value. This finding, however, does not diminish the relevancy of this lease as a *643 test of the municipality’s estimate of functional obsolescence as discussed hereinabove.

SUBDIVISION OR ANTICIPATED USE METHODOLOGY DISCOUNTED CASH FLOW ANALYSIS

Despite the parties’ suggested alternative valuation methods, both ultimately conclude that the highest and best use of the subject property is for subdivision and development of one-family residential lots.
It is true that the courts have not always discussed the discounted cash flow analysis (DCF) as a method for arriving at true market value for real estate in the most positive terms. See University Plaza Realty v. Hackensack, 12 N.J.Tax 354 (Tax 1992), aff'd 264 N.J.Super. 353, 624 A.2d 1000 (App.Div.), certif. denied, 134 N.J. 481, 634 A.2d 527 (1993); Genola Ventures-Shrewsbury v. Shrewsbury, 2 N.J.Tax 541 (Tax 1981). Indeed, in University Plaza Realty, the court stated as follows:
The DCF method, as applied to tax valuation proceedings, is an amalgam of interdependent, attenuated assumptions of limited probative value. Whatever may be its utility in other contexts, its use in this case can only be described as an exercise in financial haruspication.[2]
Id. at 368.
However, the reservations of the court in using the DCF method in prior cases are not warranted in this instance. Judge Crabtree’s decision in University Plaza Realty was based on specific facts and circumstances that do not exist here.
In that case, Judge Crabtree found that another more traditional methodology provided a more reliable analysis. He described the expert witness’s testimony in utilizing the DCF analysis as follows:
Plaintiffs expert has attenuated his assumptions still further not only by projecting rental income beyond the expiration dates of the leases in place on the valuation dates but also by refining contract rents according to whether leases were in place *644 or space was leased to new tenants or to old tenants under renewals. Only one of the leases in place on the valuation dates extends as far as the expert’s ten-year projection period. As stated above, 10.7% of the leasable area was leased to 1994, three years before the end of the projection period and only 5.4% of the leasable area was leased to 1995, two years before the end of the projection period. Id. at 367.
There, the information used by the appraisers required speculation with regard to every conclusion. The facts in this case, by contrast, included the stipulated value of a finished lot, as based upon current sales of similar one-family residential lots that required little or no adjustment. In addition, the attorneys in University Plaza Realty projected the sales of the lots over ten years, while in the instant case it is estimated that only a five-year sellout plan would be necessary.
The instant case is also distinguishable from Tall Timbers, Inc. v. Vernon Tp., 5 N.J. Tax 299 (Tax 1983). In that case, Judge Lasser determined that the DCF method was inappropriate for the valuation of campsite lots in a campground. However, the situation there was different from that in this case. There, the lots were already subdivided and some of them had already been sold. Therefore, there were several different taxpayers involved and evidence of market value already existed. Here, the land has not been divided into lots, and the value of property “before development ha[s] little relation to the value of the developed property.” Id. at 306.
Judge Lasser acknowledged that there is appraisal authority to support a developer’s discount for marketing a subdivision. In rejecting the use of the DCF method for valuing Tall Timbers, the court reasoned:
However, this method measures the value of an entire subdivision to a single owner. The discounting process takes into consideration both the marketing cost and the time period required to sell all of the lots. For local property tax assessment purposes, each condominium campsite must be assessed separately. Id. at 306.
There is no such concern in the instant case, because there are no subdivided lots, and there is a single owner.
In Genola Ventures-Shrewsbury v. Shrewsbury, 2 N.J.Tax 541 (Tax 1981), as in University Plaza Realty, the court found that the *645 taxpayer’s expert witness’s DCF analysis contained far too many assumptions not supported by reliable evidence. In that case the court found that neither party submitted rehable evidence for purposes of establishing true value. Judge Andrew analyzed the DCF methodology and, in fact, recited from numerous texts which establish the DCF analysis as a viable method of establishing true value if certain steps are followed:
1. Identify the economic bracket of the residents and check the range of sales prices of typical new homes in the area.
2. By distribution, or comparison with lot sales in similar subdivisions, decide what figure represents a typical lot value in this category of development.
3. Study and lay out a subdivision plan to develop typical lots.
4. Project the total probable gross sale price for these lots.
5. Estimate development costs to include:
a. Engineering or other fees
b. Cost of streets and utilities
e. Advertising and cost of sales.
6. Estimate overhead and administrative costs to include:
a. Taxes and inspection fees
b. Financing fees and carrying costs.
7. Deduct an adequate profit allowance to provide incentive for the developer so that the calculated value of the raw land is exclusive of development profit. (Alternatively, profit may be provided for in the rate used for capitalization in the discounting process.)
8. Deduct for time lag by discounting, at an appropriate risk rate, the annual net income flow over the time needed for completion and market absorption of the project. [The Appraisal of Real Estate, supra at 148],
Genola Ventures, su/pra at 547.
In order to establish their respective positions regarding value by this approach, each party submitted to the court a proposed subdivision analysis. Taxpayer’s proposal included twenty-five one-family lots in Cresskill and nine one-family lots in the Alpine portion (not under valuation consideration in this case). Taxpayer’s engineering expert produced a breakdown of direct and indirect costs related to the project and taxpayer’s appraisal expert concluded that the development and sale of all twenty-five lots would require a period of five years. He further opined that the costs would be incurred during the first two years with actual sales to take place over the final three years. He utilized a twelve percent discount factor and further deducted entrepreneurial prof *646 it of fifteen percent, sales commission of six percent, management and overhead of three percent. The information projected over each of the five years produced annual cash flows which were applied to the Ellwood Tables.[3] The result of this computation produced the present worth of the future cash flow for each of the five years. Taxpayer’s analysis produced a value for the subject property for each of the relevant assessment dates of $2,983,000.
The municipality’s analysis first utilized a twenty-four-lot plan (this plan did not show either development of the Alpine portion of Tamcrest or access from the Cresskill development to the Alpine area), a four year waiting period as opposed to five years, a ten percent discount rate as opposed to twelve percent, entrepreneurial profit of twelve percent rather than fifteen percent, as well as sales commission and management costs. The municipality’s appraisal expert also utilized the Ellwood Tables in the same fashion as did the taxpayer. The result of the municipality’s discounted cash flow analysis was approximately $6,000,000 for its initial twenty-four-lot project. This value, when added to the municipality’s appraisal expert’s valuation of the catering building and land (5.58 acres), resulted in a total value of the subject property in the amount of approximately $11,700,000.
At this court’s request, the parties’ engineering experts recalculated direct and indirect costs and modified their respective proposals with respect to said cost estimate. For example, taxpayer already produced a twenty-five-lot subdivision plan with an estimate of soft and hard costs. After discussion between the experts, the taxpayer’s estimate of costs became fixed and agreed upon between the parties at $2,180,880, which was significantly less than the amount originally urged by the taxpayer. Taxpayer’s experts, at the request of the court, produced analysis based upon both a four and five year development and sale period. The expert also calculated value utilizing a ten percent, eleven percent, and twelve percent discount rate analysis. In effect, this pro *647 duced a series of models with different values depending upon the aforementioned variables.
The municipality’s experts likewise produced a series of models. Their initial twenty-four-lot subdivision plan was amended to include an additional four lots (totaling twenty eight) based upon utilizing the 5.58 acres for four extra lots instead of maintaining the catering building. The plan was further amended to indicate additional road development between Cresskill and Alpine to provide access to the Alpine portion of taxpayer’s property. The reason for this is an acknowledgment that a prospective purchaser would necessarily develop the entire parcel (54 ± acres), including Alpine at the same time.
The experts also stipulated as to the direct and indirect costs (Cresskill only) as required by the municipality’s engineering expert to accomplish this newly modified twenty eight-lot subdivision plan for Cresskill. The municipality’s expert then provided a series of models utilizing both a four and five year estimate of development and sellout of the lots, a ten percent, eleven percent, and twelve percent discount rate, as well as sales and management expenses. What was produced by the municipality was similar to taxpayer’s series of models resulting in different values, depending upon the variables.
This resolved the issue of labor and material cost factors relating to the development. For this reason, the court can now focus on the determination of the reliability of the evidence as to the variables leading to a finding of true value and consequently the highest and best use of the subject and its true value.
In deciding this case, it is necessary to point out again that the development, if physically accomplished, would include both the Cresskill and Alpine portions of the property. Taxpayer urges that since an Alpine lot is worth more than a Cresskill lot, a developer would necessarily attempt to maximize the Alpine property even if the result would reduce the value of the Cresskill property. The focus of this litigation is not the determination of which plan is most profitable. In determining what price a purchaser would pay for the subject property, however, profitabili *648 ty is a factor. This court is required to determine the highest and best use of the Cresskill property and consequently the value of same. In providing road access between both sections, this court can value the Cresskill portion as part of an integral plan for the entire 54 ± acres.
This court finds that the twenty eight-lot subdivision proposal submitted by the municipality’s expert witnesses, with the additional road access to the Alpine portion, is the best evidence of the highest and best use of the Cresskill property. Not only does the municipality’s one-family lot proposal include four more lots than taxpayer’s proposal, but also the stipulated costs per lot for the municipality’s proposal are significantly less per lot than taxpayer’s proposal. This proposal’s higher total sales and lower costs provide more profit to the developer and a higher value for the municipality.
Testimony also revealed that a number of the lots on taxpayer’s twenty five-lot proposal violate certain zoning requirements. Taxpayer’s expert witness acknowledges same and indicates that altering specific lot lines could cure the defects. The municipality’s twenty eight-lot proposal has no ordinance violations whatever and requires no additional variances. The lots appear to be more uniform in size and shape. In determining the highest and best use, it must be remembered that the use must be lawful; the municipality’s proposal clearly meets that criteria.
This court finds more reliable that the project would take five years from beginning to end for a complete sell-out of the existing lots. There is no evidence in this proceeding that indicates a rising market as perhaps existed in the mid-1980s. The Tammy Brook experience itself helps the court by illustration. In that instance, the nearly 100 lots were sold over a period of six years between 1989 and 1994, after two years of obtaining approvals and completion of site work. Acknowledging that the period between 1989 and 1994 was unquestionably a poor real estate market resulting in lower property values and lower sales prices and considering that the assessment years of 1993, 1994 and 1995 overlap with the downward trend in the real estate market, a five *649 year projection for sell-out of the subject lots is the more reliable recommendation.
The second major variable is the discount rate. Both parties have produced evidence attached to their appraisal reports that would appear to substantiate their respective recommendations, the taxpayer at twelve percent and the municipality at ten percent. Both parties proffered some testimony with respect to the discount rate to be utilized in this analysis. Simply stated, each party’s analysis has some merit coupled with subjective input. There is insufficient evidence from which to determine with any degree of probability that one party’s estimate of an appropriate discount rate is any more reliable than the other. While this court hesitates to merely divide the difference, the range (ten percent to twelve percent) at least affords this court the ability to determine that eleven percent must be a fair compromise of the reasonably small difference between the parties’ estimates.
The last of the major variables included within the parties’ discounted cash flow analysis includes the percent of entrepreneurial profit wherein the taxpayer suggested fifteen percent and the municipality suggested twelve percent. Little testimony was proffered as to the basis for these figures. It appears from the testimony that was offered, however, that other than the Tammy Brook experience, which occurred between 1987 and 1995 (a span of eight years), there was no other development similar enough to the subject from which to glean market information. The period between 1989 and at least until 1994 suggests a possible downward trend in values which possibly has leveled off in 1995, the last of the three assessment years. This court concludes that the proposed development entails some risk. There is enough evidence that permits this court to make a finding as between the proffered entrepreneurial profit recommendation by each party. Obviously the taxpayer’s appraisal expert contends that the subject investment contains a higher degree of risk than suggested by the municipality’s expert witness.
There is no question that this investment requires a purchaser to either advance the investment capital for direct and indirect *650 costs prior to receiving any returns on the investment or borrow the investment funds. Either way, the prospective purchaser is at immediate risk. The early 1990s were marked by a downward trend in the value of real estate. There is testimony, however, to indicate that Bergen County contains little, if any, real estate for development that would create competition for the subject investment. While the doldrums of the real estate market may require five years for an investor to sell out the project, the lack of competition would require this court to conclude that an investor would welcome twelve percent as opposed to fifteen percent for entrepreneurial profit.
This twenty eight-lot subdivision provides this court’s determination as to the highest and best use of the subject property as of the relevant assessment dates. The Tax Court in Ford Motor Co. v. Edison Tp., supra, established the following criteria for the determination of the highest and best use of property:
Pour criteria are implicated in any highest and best use analysis. In order for a particular use to be the highest and best it must be: 1) legally permitted, 2) physically possible, 3) economically feasible, and 4) the most profitable.
Id. at 161 (citing American Institute of Real Estate Appraisers, The Appraisal of Real Estate, 274 (9th Ed.1987)).
In terms of the evidence in this ease, this court has already determined that the proffered partial use of the subject property for continuation of the catering building is not legally permitted and, furthermore, not likely to be permitted by further municipal action. This court also doubts that this use would be the most profitable. Maintenance of the existing golf course and catering use likewise is probably not the most profitable. The result is that a subdivision involving one-family homes is the highest and best use. The twenty eight-lot subdivision clearly complies with all four criteria as detailed hereinabove.
The model provided by the municipality’s appraisal expert that this court finds most representative of the highest and best use of the subject property is a twenty eight-lot subdivision. This court, as aforesaid, determined that five years would be needed to sell out all of the twenty-eight lots at $455,000 each. _
*651 The recommended model provides that in the first year no sales were consummated; however, expenses, which this court found to be appropriate, were incurred. In years two through five sales occurred and expenses were incurred. The result provides that in the first year the investor would incur a loss; however, in years two through five, sales proceeds exceeded expenses thereby realizing a positive net cash flow for those four years. The municipality’s appraisal expert then applied the Ellwood factor based on this court’s approved eleven percent discount rate over the five year period to provide this court with the present value of the future benefits or losses for each of the five years in question and, consequently, the entire project. The result of the discounted cash flow analysis provides a value of $5,143,990, which this court will round to $5,144,000. Based upon the testimony and evidence in this case, this value is determined to be applicable for 1993, 1994 and 1995, the relevant years in question. (See Appendices A and B.)
In the presentation by the municipality of the various models incorporating contested variables, its expert witness proffered an additional valuation which he calls “raw land value.” This value in each of the models was higher than the values obtained by the discounted cash flow analysis. The theory behind the raw land value is based solely on the premise that the lots would be sold immediately within year one. This court has already determined that five years will be needed to sell out the project and, therefore, the methodology described as raw land value by the municipality’s expert witness is unrealistic and not supported by the weight of the evidence.
For 1993, a revaluation year, true value shall be the assessment, which the court finds to be $5,144,000 rounded.
For 1994 and 1995, the ratio of assessment ($11,125,200) to this court’s finding of true value ($5,144,000) clearly exceeds 100%, thereby granting to the taxpayer relief under chapter 123 for those two years. Applying the average ratio (90.25%) to true value ($5,144,000) results in an assessment for 1994 for the subject *652 property in the amount of $4,642,460, which this court rounds to $4,642,500.
For 1995, the average ratio was 89.46%, which when applied to true value ($5,144,000) results in an assessment of $4,601,822, which this court rounds to $4,601,800.
With respect to the allocation of the assessment as between land and improvement, this court has already determined that the most reliable expert testimony demonstrates that the value of the subject property is based solely on its vacant land value for development being greater than the land as currently improved. N.J.S.A. 54:4-26 as well as N.J.AC. 18:12-2.8b, however, require at least nominal value designated for improvements.
Judgment shall be entered as follows:
1993
Land $5,143,900
improvement _100
Total $5,144,000
1994
Land $4,642,400
Improvement _100
Total $4,642,500
1995
Land $4,601,700
Improvement _100
Total $4,601,800
APPENDIX A
Sale Period of Five Years for Improved Lots:
Year Sold: 1st Year 2nd Year 3rd Year" 4th Year 5th Year
INVENTORY SOLD: 0 12 Lots 6 Lots 6 Lots 4 Lots
Contract Price: 0 $ 455,000.00 $ 455,000.00 $ 455,000.00 $ 455,000.00
GROSS SALE PRO-0 $5,460,000.00 $2,730,000.00 $2,730,000.00 $1,820,000.00
CEEDS
Entrepreneurial Ongoing Expenses Profit $ 655,200.00 $ 327,600.00 $ 327,600.00 $ 218,400.00
*653 APPENDIX A — Continued
Sales Commissions 6% 0 $ 827,600.00 $ 163,800.00 $ 163,800.00 $ 109,200.00
MANAGE- $ 63,700.00 $ 63,700.00 $ 63,700.00 $ 63,700.00 $ 63,700.00
MENT/OVERHEAD: .025
HARD/SOFT COSTS $304,299.00 $1,762,990.00 0 0 0
REAL ESTATE $123,410.00 $ 234,780.00 $ 117,390.00 $ 68,695.00 $ 89,130.00
TAXES: INTEREST $ 7,400.00 $ 111,853.00 0 0
ESTIMATED EXPENSES: ($498,809.00) $3,155,623.00 $ 672,490.00 430,430.00 613,795.00
NET SALES PROCEEDS RD: ($498,809.00) $2,804,877.00 $2,057,510.00 $2,116,205.00 $1,389,570.00
APPENDIX B
DISCOUNT ANALYSIS OVER FOUR YEARS AT 11%
Year-1) - ($ 498,809.00) x .900901 = ($ 499,378.00)
Year-2) $2,804,377.00 x .811622 = $1,870,283.00
Year-3) $2,057,510.00 x .731191 = $1,504,433.00
Year-4) $2,116,205.00 x .658731 = $1,394,010.00
Year-5) $1,389,570.00 x .593451 = $ 824,642.00
Total Sales $5,593,368.00 less $449,378.00 = $5,143,990.00
Say - $5,145,000.00

 Genola Ventures Shrewsbury v. Borough of Shrewsbury, 2 N.J.Tax 541 (Tax 1981) American Institute of Real Estate Appraisers, The Appraisal of Real Estate 147 (7 ed. 1978); Fuller, "Appraisal of a Proposed Residential Subdivision Development,” in Friedman Encyclopedia of Real Estate Appraising 662 (3 ed. 1978).

 Derived from “haruspex /ha-ras-peks, har-as-/ n, pi ha-rus-pi-ces /ha-ras-pa-séz/ [L]: a diviner in ancient Rome, basing his predictions on inspection of the entrails of sacrificial animals.” Webster’s New Collegiate Dictionary, 520 (1979).

 American Institute of Real Estate Appraisers, Financial Tables, "Reversion Factors Present Value of a Dollar" 114 (1992)