LASSER, P.J.T.C.
Taxpayers contest the 1979 assessments on their parcels of vacant land (campsites) in a condominium campground community known as Tall Timbers, located on Route 564 in Vernon Township, Sussex County, New Jersey. These taxpayers are Tall Timbers, Inc., the condominium campsite developer, and *302 individuals who purchased their campsites from Tall Timbers, Inc. In 1974 Tall Timbers, Inc. entered into an agreement to purchase, and in 1975 purchased, the campground for $1,100,000. At the time of the purchase the property was rezoned as a “seasonal recreation” zone.
Each parcel is approximately 2,000 square feet in size and each was assessed separately in 1979 at $5,600. These assessments were affirmed by judgments of the Sussex County Board of Taxation. In 1978 each of these campsites was assessed at $2,800.
The complaint alleges that the assessments of 534 campsites are in contest. However, Schedule A attached to the complaint lists only 296 campsites in contest, 69 of which are owned by Tall Timbers, Inc. Taxpayers’ attorney acknowledges that only the campsites on Schedule A are in contest.
Taxpayers contend that the assessments are in excess of fair market value and in excess of the common level or average ratio applicable in the taxing district. Taxpayers also contend that the assessor acted unconstitutionally in singling out taxpayers’ property for assessment increase without increasing other assessments in the taxing district.
The subject parcels are a portion of a 250-acre tract of land. Each campsite has a water spigot and an electric meter and has access to the campground septic system. Access to the campsites is by private gravel roads. One recreation vehicle no larger than 8 feet by 35 feet may be parked on each campsite. This vehicle must be towable and its wheels may not be removed. Mobile homes are prohibited. No improvements may be constructed on a campsite except a deck the length and width of the recreation vehicle (which may not be attached to the vehicle), a screened shed and an outside table. Occupancy of a campsite for more than 30 consecutive days is prohibited.
Upon the purchase of a campsite, the owner receives a deed to the parcel which includes an interest in the condominium common elements. These common elements include roadways, bath house, sewer and water utilities and wooded areas. Each camp *303 site owner pays an annual fee for the maintenance of the bath house and sewer and water utilities, and a property owner’s assessment for road maintenance and security costs.
A 13-acre lake, a public beach, a swimming pool and pavilion, a teenagers’ recreation center and a clubhouse (recreation facilities) are not part of the common elements. They are owned by Tall Timbers, Inc. but campsite owners have the right to use the recreation facilities upon payment of an annual fee. Most campsite owners pay the fee and use the recreation facilities.
There was testimony that Tall Timbers could have chosen to structure its sales so that a major share of each campsite’s purchase price was allocated to a “membership” fee but, to make the project marketable, chose to structure each sale so that the entire purchase price was attributable to the deed.
The vice-president of Tall Timbers, Inc. testified that development costs (engineering, construction of roads and paths, sewer, water, electric, bath houses, overhead, administration and marketing) amounted to $2,300 per campsite in 1978-1979.

Taxpayers’ Appraisal Expert’s Valuation

Taxpayers’ appraisal expert averaged the sales prices of five 1978 campsite sales in the Tall Timbers condominium campground to find an average 1978 selling price of $6,380. He testified that the sales price of each campsite did not reflect its value because it included higher than normal overhead and marketing costs required by the nature of the project. He concluded that this figure should be reduced by 50% to adjust for overhead and marketing costs and, by this approach, arrived at an October 1, 1978 value for each campsite of $3,190. Using the cost approach (adding the acquisition, improvement, overhead and marketing costs for each campsite), taxpayers’ appraisal expert concluded that each campsite had a value of $2,600. He averaged this $2,600 cost approach value with the market approach value of $3,190 to conclude that, as of October 1, 1978, each campsite had a value of $2,895.
*304 In addition to his market and cost approach values for individual campsites, taxpayers’ appraisal expert relied on four sales of larger parcels, including the 1975 sale of the subject property, to value the entire campground project. These four sales averaged $3,186 an acre, and taxpayers’ expert arrived at a value for the entire property by this method of $790,128 (248 acres X $3,186).
This expert also used another method to value the campground project as follows:
89 acres for 534 campsites at $2,895 a campsite $1,545,930
159 acres at $2,000/acre 318,000
Improvements as assessed in 1975 72,000
Total $1,935,930
The expert averaged the results of his two methods of valuing the entire campground project, $790,128 and $1,935,930, to arrive at a value for the project of $1,363,029 as of October 1, 1978.
The taxpayers’ expert concluded that, as of October 1, 1978, the property had the following values:
The entire property $1,363,029
An average 2,000 square foot campsite $ 2,895
This expert’s value of the entire property included the value of the common elements and recreation facilities, although he did not separately value them.

Taxing District’s Appraisal Expert’s Valuation

The appraisal expert for the taxing district analyzed over 400 Tall Timbers campsite sales for the period 1975 through 1980 and arrived at a value as of October 1,1978 of $7,310 for each of the sold campsites.
He found a discounted value for the unsold campsites of $4,528 a campsite. He arrived at his discounted value by projecting that the developer would sell all campsites by the end *305 of 1982. He estimated the cash flow from campsite sales from 1979 through 1982 and discounted the annual net cash flow. Using this method he valued each sold campsite at $7,310 and each unsold campsite at $4,528, concluding that the value of the entire project as of October 1, 1978 was $5,760,000 (rounded). This opinion of the market value of the entire project includes the campsites, common elements and recreation facilities. This expert did not separately value the common elements or recreation facilities.

Valuation Conclusion

I must determine the proper assessment for each of the separately assessed campsites. Both experts have valued the campsites using campsite sales prices. The October 1, 1978 per campsite value conclusions of the experts are:
Taxpayers’ Expert
Market Cost
Approach Approach
Value Value Average
Taxing District’s Expert
Sold Unsold
Campsites Campsites
$3,190 $2,600 $2,895
$7,310
$4,528
There is ample evidence of the market value of the subject campsites. The taxing district’s expert analyzed over 400 sales in the Tall Timbers, Inc. condominium campground between 1975 and 1980, of which more than 200 sales were in the years 1977-1979. The campsites which were the subject of the sales analysis are all similar.
There is no evidence that each campsite sale cannot be used as a comparable sale for all campsites in the condominium campground. Both experts found a per campsite value which they then applied to all campsites before discounting. I reject the taxpayers’ expert’s cost and acreage approaches because they include use of the 1975 sale of the entire campground before development and because they used the 1975 tax assessment of the property as a part of the calculation of value. The 1975 sale *306 and assessment before development have little relation to the value of the developed property. I conclude that the market approach is the proper approach for the valuation of the subject campsites.
I find the market approach conclusion of the taxing district’s expert that each campsite is worth $7,310 more persuasive than taxpayers’ expert’s conclusion that the value of each campsite before discounting is $6,380. The taxing district’s expert analyzed a substantial number of campsite sales while the taxpayers’ expert analyzed only four campsite sales.
Taxpayers’ expert discounted the sales prices of all of the subject campsites. The taxing district’s expert discounted only the sales prices of the unsold campsites. There is appraisal authority to support a developer’s discount for marketing a subdivision. Boykin, “Developmental Method of Land Appraisal,” The Appraisal Journal 181 (April 1976); American Institute of Real Estate Appraisers, Subdivision Analysis (1978). However, this method measures the value of an entire subdivision to a single owner. The discounting process takes into consideration both the marketing cost and the time period required to sell all of the lots. For local property tax assessment purposes, each condominium campsite must be assessed separately. N.J.S.A. 46:8B-19. Each campsite must be assessed “according to the same standard of value.” N.J. Const. (1947), Art. VIII, § I, par. 1(a). This standard of value is market value. Frater Corp. v. Tax Appeals Div., 80 N.J.Super. 427, 194 A.2d 11 (App.Div.1963).
In re Summit House Real Prop. Assessment Apps., 22 Pa. Commw. 462, 349 A.2d 505 (Commw.Ct.1975), dealt with the valuation of condominium apartments for assessment purposes. The taxpayers in that case argued that the apartment complex should be valued as a whole and that this value should then be allocated to the individual condominium units. The court, in rejecting taxpayers' valuation approach and holding that each separate condominium unit must be separately valued, stated that “there is no lack of uniformity involved in taxing a property owner only on the market value of the property he owns, for *307 it is real estate generally which is entitled to uniform treatment, and the condominium apartments here are separate parcels of real estate which as such have been treated uniformly with other separate parcels of real estate...”
The Pennsylvania court construed § 701 of the Unit Property Act, which provided that each condominium unit be assessed “as a separate parcel of real estate entirely independent of the building or property of which the unit is a part.” 68 Pa.Stat. § 700.701. New Jersey has a similar statute which requires that property taxes shall be separately assessed against each condominium parcel and not the condominium property as a whole. N.J.S.A. 46:8B-19. This statute originally provided that the total assessments for all of the condominium units could not exceed the assessment of the property as a single parcel if it had not been a condominium. This provision was deleted by the Legislature in 1975. L. 1975, c. 2, § 1. The Senate Revenue Finance and Appropriations Committee’s statement attached to the bill deleting this provision stated: “This bill . .. allows an assessor to establish a fair market value on each unit without being restricted to the value as a single parcel.” Clearly, the Legislature intended to remove any limitation on the assessment of condominium units so that these units would be assessed and taxed in the same manner as other real property.
In the subject case, uniformity of assessment requires the assessment of each campsite to be based on its market value as reflected by comparable sales, without discounting. Marketing costs and time considerations are reflected in the sales price of each campsite. There is no justification for discounting the sales price of a campsite that has been sold. To value a sold campsite at a discounted value would be to use a “standard of value” different from that used for all other properties in the taxing district, which are valued based on their market value. To permit discounting of the sales prices of the sold campsites would result in a lack of uniformity between these campsite assessments and other assessments in the taxing district. Uniformity of assessment requires separate valuation of each campsite, whether one person owns one or many.
*308 Uniformity of assessment also requires that both the sold campsites and the unsold campsites in the Tall Timbers campground be valued by the same market value standard and that all of the campsites be valued at the same market value standard as other properties in the taxing district. For this reason I cannot accept taxpayers’ expert’s contention that all of the campsites must be assessed at a discounted value, whether sold or unsold, and I cannot accept the taxing district’s expert’s opinion that the sold campsites be valued at their market value, as reflected by the sales prices, but that the unsold campsites be assessed at a discounted value.
I find no merit in taxpayers’ contention that the campsite sales prices should not be used for assessment purposes because the developer could have structured a lower sales price and charged a separate membership fee. The developer chose to structure the transaction as a sale of real property and the court is obliged to follow the transaction as structured. General Trading Co., Inc. v. Taxation Div. Director, 83 N.J. 122, 416 A.2d 37 (1980).
Taxpayers argue that the recreation facilities are taxed twice because the facilities are separately assessed and their value is also included in each campsite sales price. The recreation facilities are specifically excluded from the campground project’s common elements. Ownership remains in Tall Timbers, Inc., but a campsite owner may use these facilities upon payment of an annual fee. There is no proof of the value of the recreation facilities. There is also no proof that any or all of the value of the recreation facilities is included in the value of the campsites. Therefore, there is insufficient evidence to conclude that there should be a deduction from the value of each condominium campsite because the value of the recreation facilities is included in each campsite’s assessment and these facilities are also separately assessed. See Tower West Apt. Ass’n v. West New York, 2 N.J. Tax 565 (Tax Ct.1981).

*309
Discrimination

Taxpayers have alleged discrimination and seek relief by application of chapter 123 of the Laws of 1973. The value of each campsite is $7,310. Under chapter 123 the 1979 common level range for Vernon Township has a lower limit of 62% and an upper limit of 86%. The 1979 assessment of $5,600 is 76.6% of $7,310, which is within this common level range. Taxpayers are therefore not entitled to have their $5,600 assessments reduced under chapter 123.
Taxpayers also claim that the increase in each campsite assessment from $2,800 in 1978 to $5,600 in 1979 is invalid spot assessing. An assessor is required annually to assess all real property in a taxing district at its taxable value. N.J.S.A. 54:4r-l, 23. It is the obligation of the assessor to continually revise and improve the quality of his assessments, and revisions should be made when, in the assessor’s opinion, property sales so indicate. In the subject case the assessor increased the assessments on the campsites when he was made aware that the sales prices of the campsites were substantially in excess of the assessments. The assessments as increased fall within the common level range for the taxing district.
Although mathematical perfection in assessment often is not attainable, an assessor should not be prevented from annually revising assessments to assure that the burden of taxation is borne as equitably as possible.
While practicalities obviously preclude most assessors reviewing every assessment line item every year ... there should nevertheless be alertness to changed valuation factors peculiarly affecting individual properties in years between revaluations and requiring prompt revision of such assessments in fairness to the particular taxpayer or to the taxing district. [Tri-Terminal Corp. v. Edgewater, 68 N.J. 405, 414, 346 A.2d 396 (1975), cert. den. 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976)].
If an assessor cannot change one assessment unless he changes all assessments in the taxing district or those in a major portion of the taxing district, the assessor’s annual assessing function will be frustrated. Taxpayers cite Baldwin Constr. Co. v. Essex Cty. Bd. of Tax., 16 N.J. 329, 108 A.2d 598 (1954), as support for *310 their claim that a change in assessment of one parcel of property without a corresponding change in assessment of all other taxable parcels results in discrimination. In Baldwin the Essex County Board of Taxation increased the assessments of several taxable parcels in some municipalities after the local assessors had submitted their assessment lists to the board for review. The court found that the increases caused “glaring disparities” in the otherwise uniform and equal assessments throughout the municipalities and consequently resulted in discrimination. The Baldwin case is distinguishable. While an assessor may not change an assessment by arbitrarily singling out a taxpayer for unequal assessment treatment, to establish a claim of discrimination a taxpayer must prove that uniform municipal-wide assessment is disturbed by the assessor’s change. There is no such proof in this case. I conclude that taxpayers have no established a claim of discrimination.
The Clerk of the Tax Court is directed to enter judgment affirming the judgments of the Sussex County Board of Taxation for the 296 campsites shown on Schedule A attached to the complaint.