705 A.2d 1270

TAMBURELLI PROPERTIES ASSOCIATION, PLAINTIFF–
RESPONDENT, v. BOROUGH OF CRESSKILL,
DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 3, 1998—Decided February 25, 1998.

Before Judges KEEFE, PAUL G. LEVY and WECKER.

*Anthony D. Andora* argued the cause for appellant (*Andora, Palmisano & Geaney*, attorneys; *Mr. Andora*, on the brief).

*Edward G. Rosenblum* argued the cause for respondent (*Rosenblum Wolf & Lloyd, P.A.*, attorneys; *Mr. Rosenblum* and *John R. Lloyd*, on the brief).

The opinion of the court was delivered by

PAUL G. LEVY, J.A.D.

After a trial, the Tax Court reduced the property tax assessment on a tract of land in Cresskill and Alpine Boroughs.[1] The property, known as Tamcrest Country Club, consists of a golf course, tennis courts and swimming pool (with their usual appurtenances) and a clubhouse/banquet hall. In a thorough and well-reasoned opinion, Judge Kahn found that the highest and best use of the tract would be as a residential subdivision, which would cover the entire tract, thus eliminating the clubhouse. The final judgment significantly reduced the municipal assessments for the three years under review (1993, 1994, and 1995), especially as to improvements, which were found to have only a nominal value. The amount of the reduction in assessment in the three tax years

---

[1] Only the portion of the property located in Cresskill is of concern here.

in question ranged from $5.9 million dollars in 1993 to $6.5 million dollars in 1995. *Tamburelli Properties Assn. v. Cresskill Borough*, 15 *N.J.Tax* 629 (Tax 1996). In a separate action, the court entered judgment reducing the 1996 assessment pursuant to the provisions of the Freeze Act. *N.J.S.A.* 54:51A–8.

Contending that the underlying assessments were improperly calculated, and that the Freeze Act judgment was entered prematurely, the municipality has filed two appeals. We affirm the first, essentially for the reasons expressed by Judge Kahn, and dismiss the second as moot.

At trial, the taxpayer valued the property as a going business, using the income capitalization method, alternatively calculating value based on use of the entire tract as a residential subdivision with value computed pursuant to a discounted cash flow (DCF) analysis over five years. The municipality claimed the highest and best use of the property would be to develop thirty acres into twenty-four one acre residential lots and maintain the clubhouse as a catering business on the remaining 5.58 acres. It also calculated the value of the residential subdivision by a DCF methodology, over four years. The clubhouse was valued by the cost approach and the land under it by a market sales analysis. Regardless of the methodology, the parties stipulated that the finished residential lots in the hypothetical subdivision would each have a market value of $455,000.

Judge Kahn resolved the conflict over which subdivision plan would produce the "highest and best" use of the property by deciding that the municipality failed to prove a "reasonable probability that the [clubhouse] use would be permitted [if the property were subdivided for residential uses]". *Id.* at 638. He also found that "the municipality's appraisal expert's valuation analysis of the building and land thereunder is insufficient ... to determine value." *Id.* at 641. Each appraisal expert used the discounted cash flow analysis and each concluded the value would be greater under that method than the other methods each had considered. Judge Kahn decided that the highest and best use of the property

was for "one-family home development," specifically, a subdivision into twenty-eight lots of approximately one acre each, which would be developed over a five year period. *Id.* at 642, 648. He pointed out that this hypothetical use met the criteria of *Ford Motor Co. v. Edison Tp.,* 10 *N.J. Tax* 153, 161 (Tax 1988), *aff'd o.b. per curiam* 12 *N.J. Tax* 244 (App.Div.1990), *aff'd* 127 *N.J.* 290, 604 *A.*2d 580 (1992), in that it was "1) legally permitted, 2) physically possible, 3) economically feasible, and 4) the most profitable."

## I.

■ The municipality first contends that the exclusion of the clubhouse from the use considered highest and best was erroneous. Its argument centers on the zoning classification of the clubhouse which existed as a nonconforming use on the country club property. The judge was not persuaded by testimony from various municipal officials to the effect that the municipality would allow the banquet hall use to continue after the country club ceased to exist. He decided that the reduction in lot size from 35.58 acres to 5.58 acres constituted an expansion of a nonconforming use by increasing the intensity of use on the remaining smaller lot, a situation analogous to *Razberry's Inc. v. Kingwood Tp. Pl. Bd.,* 250 *N.J.Super.* 324, 593 *A.*2d 1264 (App.Div.1991). Thus, a use variance would be required to permit the clubhouse to continue as a permitted use, but Judge Kahn found it too speculative to permit valuation based on the possibility of a variance being granted. *Tamburelli, supra,* 15 *N.J. Tax* at 637. He further considered that sales of lots in the development of adjacent property, formerly a golf course, were conditioned on demolition of the catering clubhouse located thereon. That clearly showed that buyers of high-end residences in the area do not want to live in the immediate vicinity of a busy banquet hall. As he stated, the municipality failed to produce any evidence of what effect the continued clubhouse would have on the value of the lots, "especially those closest to the buffer area." *Id.* at 638. Each of these findings have substantial support in the record and are therefore affirmed.

On appeal, the municipality advises that shortly after the judgment of the Tax Court, the local zoning ordinance was amended to permit a catering facility in this zoning district. Cresskill seeks to have us apply the "time of decision rule" as stated in *Kruvant v. Mayor & Council of Cedar Grove,* 82 *N.J.* 435, 414 *A.*2d 9 (1980). We find that contention inapposite and without merit. The focus of an appeal of property taxes is on the market value of the property as of the first of October in the applicable pretax year. *N.J.S.A.* 54:4-23. Changes to the legal status of the property after that date are not relevant, unless they were foreseeable changes. The municipality only presented evidence of a possible zoning variance or of municipal acquiescence in the continued use of the clubhouse as a nonconforming use. None of its witnesses testified about the probability of a rezoning, and there simply is no credible basis for deciding that a rezoning was foreseeable.

## II.

Judge Kahn utilized the DCF analysis to calculate the true market value of a twenty-eight lot subdivision of the property. He found DCF useful here because the parties had stipulated the value of a finished lot and estimated that it would take either four or five years to sell every lot. Thus it was appropriate to adjust the total mathematical value (28 × \$455,000 = \$12,740,000) by deducting entrepreneurial profit, sales commissions, and management and overhead expenses in order to produce annual cash flows which were then reduced to present value, and then to reflect the time it would take to complete the subdivision by applying an "absorption discount." At trial, the taxpayer and the municipality followed the same procedure, differing only by their experts' opinions as to the appropriate percentages and costs. At the court's request, the parties calculated several different models, yielding different values dependent on the variables used. Direct and indirect costs of development were stipulated for the Cresskill property. As to the parameters of value that were not stipulated, Judge Kahn explained why he found the development would take

five years, why the discount rate should be eleven percent, and why the entrepreneurial profit should be twelve percent. His findings have substantial support in the record.

■ On appeal, the municipality argues for the first time that utilization of an absorption discount to account for the development and sale of all the lots in a five year period violates the constitutional requirement that assessment of real estate should be made uniformly. Our Constitution provides:

> Properties shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value.
>
> [*N.J. Const.* art. VIII, § 1, ¶ 1(a).]

Cresskill posits that this constitutional provision requires each lot of the highest and best subdivision to be assessed separately, and without a discount factor to account for the period required to sell off all the lots, thus achieving uniformity of assessment. In support of that argument, the municipality cites *Chesterfield Assoc. v. Edison Tp.,* 13 *N.J. Tax* 195 (Tax 1993)(upholding separate assessment of each unit in 95 townhouse complex, built as individual single-family units but always owned by plaintiff and individually rented to tenants, and rejecting valuation as a single investment package rejected), *aff'd,* 14 *N.J. Tax* 181 (App.Div.1994); *Glen Pointe Assoc. v. Teaneck Tp.,* 10 *N.J. Tax* 506, 516–17 (Tax 1989) (partially finished seven-story office building valued by cost approach with deduction for cost to complete construction; absorption discount rejected because it yields an unconstitutional comparison of finished and unfinished buildings), *aff'd* 12 *N.J. Tax* 127 (App.Div.1991); *Thomas J. Lipton, Inc. v. Raritan Tp.,* 10 *N.J. Tax* 202 (Tax 1988)(discount factor inappropriate to property appraised by cost approach because it double counts delay in marketing property), *aff'd,* 11 *N.J. Tax* 100 (App.Div.1989); *Glenpointe Assoc. v. Teaneck Tp.,* 10 *N.J. Tax* 288 (Tax 1988)(171 unit condominium development where each unit valued separately by market approach on completed units and cost approach on unfinished units; market discount held improper as double counting

because time for sale already factored into market conditions); *Tall Timbers, Inc. v. Vernon Tp.*, 5 *N.J. Tax* 299 (Tax 1983)(court valued each unit separately in 584 unit condominium campsite development based on comparable sales; unconstitutional to further discount because marketing costs and time considerations are reflected in sale price of each campsite); and *ITT Continental Baking Co. v. East Brunswick Tp.*, 1 *N.J. Tax* 244 (Tax 1980)(rejected taxpayer's discount for "economic obsolescence" based on time to market improvements because of size, a three building bakery complex, because *N.J.S.A.* 54:4-23 requires court to determine value for a bona fide sale on October 1 of the pretax year).

We reject all of these proffered authorities as factually inapposite in that the properties involved were capable of being valued on the comparable sales or cost approach, or were actually divided into separate economic units that could be valued separately. On the other hand, in valuing undeveloped acreage and in the absence of comparable sales of large parcels of raw land, it has been recognized that since lots in a subdivision will be sold over a period of time, an "absorption study is critical" to determine the time needed to market the lots. *Genola Ventures—Shrewsbury v. Shrewsbury*, 2 *N.J. Tax* 541, 547 (Tax 1981). Of the eight steps required by *Genola Ventures—Shrewsbury* to appraise the value of vacant land for subdivision purposes[2], Tamburelli and Cresskill

---

2 1. Identify the economic bracket of the residents and check the range of sales prices of typical new homes in the area.

2. By distribution, or comparison with lot sales in similar subdivisions, decide what figure represents a typical lot value in this category of development.

3. Study and lay out a subdivision plan to develop typical lots.

4. Project the total probable gross sale price for these lots.

5. Estimate development costs to include:
   a. Engineering or other fees
   b. Cost of streets and utilities
   c. Advertising and cost of sales.

6. Estimate overhead and administrative costs to include:
   a. Taxes and inspection fees
   b. Financing fees and carrying costs.

had no material disputes concerning the first six steps. The court's decision pursuant to the seventh step, to utilize a developer's profit of twelve percent and a discount rate of eleven percent to be applied to the cash flow over a five year period of development, is well supported by expert testimony at the trial. The last step is the "absorption discount" that defendant contends is unconstitutional. In addition to its basis in *Genola Ventures—Shrewsbury*, that discount is rooted in *Tall Timbers* where Judge Lasser distinguished the fact pattern of the campsite property under consideration from ordinary subdivisions of undeveloped land.

> There is appraisal authority to support a developer's discount for marketing a subdivision. Boykin, "Developmental Method of Land Appraisal," The Appraisal Journal 181 (April 1976); American Institute of Real Estate Appraisers, Subdivision Analysis (1978). However, this method measures the value of an entire subdivision to a single owner. The discounting process takes into consideration both the marketing cost and the time period required to sell all of the lots.
>
> [5 *N.J. Tax* at 306.]

Since there were individual extant campsites (lots) to be considered in *Tall Timbers*, the absorption discount was disallowed.

Of the cases cited by the municipality, *Chesterfield Assoc. v. Edison Tp., supra*, has facial similarities to this case. There, the parties disputed the assessment on 95 townhouses in a single development, arguing that if all 95 townhouses were placed on the market simultaneously, there would be insufficient buyers. 13 *N.J. Tax* at 210–11. The plaintiff wanted a discounting factor to be applied to the assessments to take into account the delay in marketing all the units. However, the court said that the valuation problem at issue there was "not to estimate the value of an

---

7. Deduct an adequate profit allowance to provide incentive for the developer so that the calculated value of the raw land is exclusive of development profit. (Alternatively, profit may be provided for in the rate used for capitalization in the discounting process.)

8. Deduct for time lag by discounting, at an appropriate risk rate, the annual net income flow over the time needed for completion and market absorption of the project.

[*Ibid.*]

investment package consisting of 95 townhouses, but instead to estimate the value of one townhouse at a time." *Id.* at 211. Thus, discounting was inappropriate because it would result in an unconstitutional lack of uniform taxation. *Id.* at 215. The 95 townhouses were to be valued separately in that case, thus negating the possibility of discounting. Discounting, however, would "make[ ] sense ... if one views the 95 townhouses as a single entity, i.e., one investment package." *Id.* at 216.

Tamcrest Country Club falls within that exception: the subdividing of the Tamcrest property should be valued as one single entity—the value of the entire subdivision to a single owner—as noted in *Tall Timbers, supra,* 5 *N.J. Tax* at 306. Judge Kahn recognized this when he distinguished *Tall Timbers,* noting that the campsites were already existing, with some having been sold, while here there are no subdivided lots and there is just a single owner. Therefore, DCF analysis using an absorption discount as one factor in the calculation of value is appropriate here.

We further hold that the municipality's attempt to appeal this method of valuation after embracing it at trial violates the doctrine of judicial estoppel. Judicial estoppel is an equitable doctrine precluding a party from asserting a position in a case that contradicts or is inconsistent with a position previously asserted by the party in the case or a related legal proceeding. Its roots go back to *Davis v. Wakelee,* 156 *U.S.* 680, 689, 15 *S.Ct.* 555, 558, 39 *L. Ed.* 578, 584 (1895). It is frequently said that judicial estoppel is meant to protect the integrity of the judicial system, designed to prevent litigants from "playing fast and loose with the courts." *Scarano v. Central Railroad Co.,* 203 *F.*2d 510, 513 (3d Cir.1953); *see also Prudential Ins. Co. v. Tp. of Parsippany–Troy Hills,* 16 *N.J. Tax* 148 (App.Div.1996)(where both parties relied on the same approach to valuation, but municipality urged another method on appeal, held that a "party may not urge one course upon a trial court and then argue on appeal that the trial court erred in adopting it"). Here the municipality cannot be permitted to argue for valuation of the subject property with an absorption

discount and then challenge the validity of that method of valuation on appeal, because the Tax Court set the discount percentage at a higher level than posited by the municipality's expert witness. This tactic has been criticized under the rubric of "invited error." *See Brett v. Great American Recreation, Inc.*, 144 *N.J.* 479, 503–04, 677 *A.*2d 705 (1996).

### III.

In the separate appeal, Cresskill contends that the Tax Court erred in fixing the 1996 assessment under the Freeze Act as soon as its judgment for 1995 was entered. The Freeze Act provides that after a successful appeal to the Tax Court, an assessment shall not be changed for the year in question and the two succeeding years after the Tax Court has rendered a final judgment. *N.J.S.A.* 54:51A–8.

Cresskill sought to apply the holding of *Curtiss Wright Corp. v. Wood–Ridge*, 4 *N.J. Tax* 68 (Tax 1982), that if a judgment was appealed to the Appellate Division and remained undecided, there was no "judgment final" as contemplated by *N.J.S.A.* 54:2–43, the predecessor statute, and the Freeze Act would not apply. When that section was re-enacted in the general revision of the tax laws in 1983, it became *N.J.S.A.* 54:51A–8. Although the enacted version used the term "judgment final," revision by the Legislative Counsel of the Office of Legislative Services, concurred in by the Attorney General, changed it to "final judgment." *See N.J.S.A.* 1:3–1. Unaware of this circumstance, in *Inganamort Bros. v. Borough of Fort Lee*, 202 *N.J.Super.* 87, 91, 493 *A.*2d 1304 (App.Div.), *certif. denied,* 102 *N.J.* 304, 508 *A.*2d 190 (1985), we held the change was intended to be substantive, and the Legislature meant to allow a freeze judgment to be entered as soon as the tax court issued its ruling, instead of awaiting the outcome of the appellate ruling on the underlying assessment. *Curtiss Wright* was, therefore, deemed inapplicable to Inganamort Bros. In light of the revelation of how the language was changed when the

revision was adopted, *Inganamort* was probably decided incorrectly.

A comparison of the language of the Tax Court Freeze Act, *N.J.S.A.* 54:51A–8, with the County Board of Taxation Freeze Act, *N.J.S.A.* 54:3–26, supports the conclusion that the term "final judgment" in the Tax Court Freeze Act means a "judgment final," that is, one no longer subject to further appeal. *N.J.S.A.* 54:3–26, in pertinent part, provides:

> *Where no request for review is taken to the Tax Court to review the action or determination of the county board involving real property* the judgment of the county board shall be conclusive and binding upon the municipal assessor and the taxing district for the assessment year, and for the 2 assessment years succeeding the assessment year, covered by the judgment, except as to changes in value of the property occurring after the assessment date.

[Emphasis added.]

There is no reason to believe that the Legislature intended the Freeze Act to apply to a Tax Court determination that remains on appeal, but not to a County Board of Taxation determination that is on appeal.

However, we need not rule on the applicability of the Freeze Act here, because both parties agreed at oral argument that the issue would be moot if we affirmed the judgment of the Tax Court. Accordingly, the second appeal (A–1806–96T5) is dismissed.

The judgment of the Tax Court of June 28, 1996 (in A–7342–95T5) is affirmed, essentially for the reasons stated in *Tamburelli Properties Assn. v. Cresskill Borough*, 15 *N.J. Tax* 629 (Tax 1996).