******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBINSON, J., with whom ESPINOSA, J., joins, concurring. I agree with the result and most of the reasoning in the majority's opinion, which reverses the judgment of the trial court dismissing the 2009 tax appeal filed by the named plaintiff, Wheelabrator Bridgeport, L.P. (Wheelabrator),[1] and a portion of the trial court's judgment assigning a new valuation in Wheelabrator's 2011 tax appeal, both of which challenge the assessment of its real property by the defendant, the city of Bridgeport (city). I respectfully disagree, however, with part II of the majority's opinion, which, in considering the valuation of Wheelabrator's property on the city's grand lists of 2010 and the years following, concludes that the trial court improperly "rejected the discounted cash flow [income] approach to valuation for property tax assessment purposes—at least as applied to properties that do not have a rental market—as a matter of law."[2] Guided largely by this court's recent decision in *Redding Life Care, LLC* v. *Redding*, 308 Conn. 87, 61 A.3d 461 (2013), I read the trial court's memorandum of decision as a proper exercise of its discretion to consider and reject the discounted cash flow method in the present case, before applying the reproduction cost approach to valuing Wheelabrator's real property. In my view, the majority's conclusion to the contrary is a significant departure from the considerable discretion that our case law has long afforded to trial courts with respect to electing the proper appraisal method by which to engage in the factual determination of property valuation. I do, however, agree with Wheelabrator's claim that the trial court's valuation of Wheelabrator's real property under the reproduction cost approach was clearly erroneous because it appears not to have accounted for the value of Wheelabrator's personal property. See footnote 13 of this concurring opinion. Accordingly, I concur in the decision of the majority to reverse in part the judgments of the trial court and order a new trial with respect to the valuation of Wheelabrator's real property.

I

I agree with the background facts and procedural history set forth in the majority opinion. I part company from the majority, however, with respect to its decision to engage in plenary review of the trial court's decision not to utilize the discounted cash flow income approach to valuation in this case. "[W]hen a tax appeal . . . raises a claim that challenges the propriety of a particular appraisal method in light of a generally applicable rule of law, our review of the trial court's determination whether to apply the rule is plenary."[3] (Internal quotation marks omitted.) *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 101; see also, e.g., *Sheridan* v.

*Killingly*, 278 Conn. 252, 260, 897 A.2d 90 (2006) (applying plenary review to trial court's unequivocal determination that "as a generally applicable rule of law, the value of a leasehold interest cannot be attributed to the lessor when valuing the lessor's property interest for assessment purposes"). When, however, "the trial court rejects a method of appraisal because it determined that the appraiser's calculations were incorrect *or based on a flawed formula in that case, or because it determined that an appraisal method was inappropriate for the particular piece of property*, that decision is reviewed under the abuse of discretion standard. . . . Only when the trial court rejects a method of appraisal as a matter of law will we exercise plenary review." (Citation omitted; emphasis altered.) *Redding Life Care, LLC* v. *Redding*, supra, 102.

I respectfully disagree with the majority's conclusion to apply plenary review, insofar as it agrees with Wheelabrator's claim that the trial court improperly rejected the discounted cash flow income approach as a matter of law, in the process dismissing the views of "both [parties'] litigation appraisers [that] it was the most appropriate method to value the property at issue." In my view, this conclusion conflicts with our recent decision in *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 87, which squarely controls our determination of the scope of the discounted cash flow issues resolved in the trial court's memorandum of decision. In *Redding Life Care, LLC*, we rejected the claim of a continuing care facility that the trial court had improperly concluded that the going concern income capitalization[4] approach applied by its appraiser "is not recognized or permitted under Connecticut law and thus may not be used to determine the fair market value of real estate and whether the plaintiff is aggrieved under [General Statutes] § 12-117a." Id., 94. We concluded that the plaintiff's claim could be resolved on the basis of an articulation issued in that case "alone," in which "the trial court stated that it had rejected [the appraiser's] testimony because it found him not to be credible, and *not* because his use of the going concern approach as a method for the valuation of real property was improper as a matter of law." (Emphasis added.) Id., 102–103. We also observed that the memorandum of decision "illustrate[s] that the trial court rejected the formula and calculations on which [the plaintiff's appraiser] relied to arrive at the valuation of the intangible business. In other words, the trial court's disagreement with the plaintiff's valuation turned on the flaws in [the appraiser's] calculations and formula, not on the method itself. For example, the trial court concluded that [the appraiser's] valuation omitted or distorted several essential aspects of [the care facility's] value as a going concern."[5] Id., 103. We concluded, therefore, that "the trial court did not summarily dismiss the method as a matter of law." Id., 104.

As this court did in *Redding Life Care, LLC*, my analysis of the record in the present case[6] begins with the trial court's May 7, 2014 articulation, which expressly stated that the court "did *not* reject the [discounted cash flow] approach as a method for valuing the subject property *as a matter of law*. The trial court rejected the testimony of the parties' experts because it found this testimony not to be credible with respect to this approach."[7] (Emphasis added.) As in *Redding Life Care, LLC*, this articulation "alone" disposes of Wheelabrator's claim that the trial court improperly rejected the discounted cash flow income approach as a matter of law. *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 103. Nevertheless, like the majority and this court in *Redding Life Care, LLC*, I go on to review the trial court's memorandum of decision in this case to determine whether it is consistent with the articulation. See id., 103–104. My review of the trial court's comprehensive analysis therein reveals absolutely nothing stating that discounted cash flow is not an approach acknowledged under existing case or statutory law for valuing real property like that of Wheelabrator, or holding accordingly as a matter of first impression.[8] Indeed, the trial court's analysis is a thorough consideration of the opinions of the parties' appraisers, Joseph Kettell, for Wheelabrator, and Mark Pomykacz, for the city. The trial court noted that both appraisers "relied primarily on the [discounted cash flow] income approach [because] the subject facility is a special purpose type property in which there is no market from which to develop comparables." After reviewing their reports and testimony, however, the trial court became "convince[d] . . . that . . . the reproduction cost approach is the only credible approach to use in this case in order to arrive at a [fair market value] of the subject property" because "[i]t takes the facility as it existed on October 1, 2008."[9] The trial court then determined that the value of the property under that approach was $314,017,430. See also part II of this concurring opinion.

In electing to use the reproduction cost approach, the trial court acknowledged that both appraisers had relied "primarily" on the discounted cash flow approach because they recognized that the property's unique and specialized use rendered it "difficult to adapt the classic concept of market value" for income producing property, namely, market rent. The trial court rejected both appraisers' opinions, concluding that the "process used in the [discounted cash flow] income approach lacks credibility" for multiple reasons that it discussed at great length, including: (1) "two experienced and knowledgable appraisers who are given the same basic facts and who use the same income approach would not be over [$2 million] apart in their valuation of the subject property"; (2) Kettell's opinion, using a thirty year holding period and fifty year life expectancy of

the facility, lacked credibility insofar as it called for large plant maintenance and capital expenditures right up to the point of the property becoming worthless at the end of that period in 2038; (3) the estimate was not a "[direct]" valuation of "the real and personal property which are the subject of these [tax] appeals"; (4) Kettell's approach utilized C corporation income tax considerations that appeared inapplicable to the appraisal of real estate generally, and to the property specifically, which is owned by a limited partnership; and (5) Kettell deducted only $2.3 million in "working capital" from the intangible items that are part of Wheelabrator's overall business value, despite the fact that "[w]orking capital, as recognized by both appraisers, represents only a portion of the intangibles of a going concern," while Pomykacz found nearly $15.5 million in intangibles, including working capital, its workforce, its computer software, and its operational manuals. Ultimately, the trial court found that, "although [both appraisers] used the [discounted cash flow] income approach as their primary method to arrive at the value of [Wheelabrator's] real and personal property, their contrasting conclusions leave a lot to the imagination." In my view, this detailed analysis, grounded in the record of this case, demonstrates that the trial court properly exercised its considerable discretion to consider, but not utilize, the discounted cash flow approach, rather than to reject its use outright as a matter of law.

I, therefore, respectfully disagree with the majority's conclusion that this determination by the trial court amounts to an improper failure to *consider* discounted cash flow—as a matter of law or otherwise—that provides a basis for reversal. In holding that the trial court rejected the discounted cash flow method as a matter of law, the majority focuses on aspects of the trial court's decision positing that "problems with the use of the approach itself" caused it to lack credibility, rather than the implementation of the approach by expert witnesses whom the trial court acknowledged to be "experienced and knowledgable . . . ." (Emphasis omitted.) This, however, is a distinction without a difference when it comes to reviewing the trial court's decision not to utilize the discounted cash flow method of property valuation, insofar as that determination was squarely grounded in the trial court's assessment of the evidence in this case. The trial court's obligation here was to consider the evidence introduced by the parties through their expert appraisers, including their proffered approaches to property valuation, and make a reasoned determination about which approach to apply given the facts of this case. See *Gebrian* v. *Bristol Redevelopment Agency*, 171 Conn. 565, 571, 370 A.2d 1055 (1976) ("[t]he value placed on the land by the court is a matter of fact and cannot be changed on appeal unless it is clear that the court failed to weigh an element of value which properly should have been consid-

ered"); *Aetna Life Ins. Co.* v. *Middletown,* 77 Conn. App. 21, 33, 822 A.2d 330 (The court noted that General Statutes § 12-63b "only requires . . . that the court give consideration to the enumerated methods to the extent applicable with respect to [rental income real] property. It does not mandate that a particular method must be utilized or otherwise serve to limit the court's discretion to choose the method that it believes will result in the fairest approximation of the subject property's value." [Emphasis omitted.]), cert. denied, 265 Conn. 901, 829 A.2d 419 (2003); *Grossomanides* v. *Wethersfield,* 33 Conn. App. 511, 513–16, 636 A.2d 867 (1994) (reversing decision of trial court because it improperly deemed report of plaintiff's appraiser to be "irrelevant" insofar as "there is no difference between the definition of 'lease fee title' as used in the report and defined therein and the definition of a fee simple estate," and that its decision to "[discount] the testimony of the plaintiff's appraiser [was] for the same improper reason it deemed his appraisal report irrelevant"). Although the discounted cash flow income approach is a recognized method for the valuation of real property in appropriate cases; see footnote 2 of this concurring opinion; neither Wheelabrator nor the majority cites any authority rendering its use mandatory with respect to properties like that of Wheelabrator. Indeed, the majority's own instructions for remand specifically emphasize that the trial court is not required to use the discounted cash flow approach at the new trial. Thus, I respectfully disagree with the majority's conclusion that the trial court's decision not to employ the discounted cash flow approach by itself warrants a new trial.

More globally, the majority's decision to reverse the judgment of the trial court, despite its detailed consideration and rejection of the discounted cash flow approach on the record of this case, appears to undermine our state's long established body of case law providing that, in "actions requiring . . . a valuation of property, the trial court is charged with the duty of making an independent valuation of the property involved. . . . [N]*o one method of valuation is controlling and . . . the* [court] *may select the one most appropriate in the case before* [it]. . . . *Moreover, a variety of factors may be considered by the trial court in assessing the value of such property. . . . [T]he trier arrives at his own conclusions by weighing the opinions of the appraisers, the claims of the parties, and his own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation. . . .* The trial court has broad discretion in reaching such conclusion, and [its] determination is reviewable only if [it] misapplies or gives an improper effect to any test or consideration which it was [its] duty to regard."[10] (Emphasis added; internal quotation marks omitted.) *Sheridan* v. *Killingly,* supra, 278 Conn. 259. Further, the trial court has

the discretion to accept or reject the experts' testimony in this regard in whole or in part. See, e.g., *First Bethel Associates* v. *Bethel*, 231 Conn. 731, 741, 651 A.2d 1279 (1995); *Stamford Apartments Co.* v. *Stamford*, 203 Conn. 586, 593–94, 525 A.2d 1327 (1987). Put differently, "[t]he trial court has the right to accept so much of the testimony of the experts and the recognized appraisal methods which they employed as [it] finds applicable . . . ." *Greenfield Development Co. of Fairfield* v. *Wood*, 172 Conn. 446, 451, 374 A.2d 1084 (1977). Ultimately, "[o]n appeal, the scope of our review is limited because it is a question of fact for the trier as to whether the method used for valuation appears in reason and logic to accomplish a just result." *First Bethel Associates* v. *Bethel*, supra, 738.

Thus, I view the trial court's election not to apply the discounted cash flow approach as a matter firmly within its discretion, which has long been settled to extend to its choice of the method of valuing the property unless cabined by a "generally applicable rule of law . . . ." *Breezy Knoll Assn., Inc.* v. *Morris*, 286 Conn. 766, 776, 946 A.2d 215 (2008); accord *Sheridan* v. *Killingly*, supra, 278 Conn. 260 (The court applied plenary review because, "contrary to the plaintiff's claim, the trial court did not simply conclude that a comparable sales approach to valuing the leasehold interest for purposes of assessing that value against the plaintiff was inappropriate for this particular property. Rather, the court stated unequivocally that, as a generally applicable rule of law, the value of a leasehold interest cannot be attributed to the lessor when valuing the lessor's property interest for assessment purposes."). For example, in *Stamford Apartments Co.* v. *Stamford*, supra, 203 Conn. 593–94, this court rejected a claim that the trial court improperly found that "the comparable sales method of evaluation, offered by the defendant's appraiser, was inappropriate" because "the trial court had the right to accept so much of the testimony of the experts and the recognized appraisal methods which they employed as [it] finds applicable" and it "specifically found that the most appropriate method of valuation was the capitalization of actual net income method, and explained why it rejected the testimony of the defendant's appraiser." (Emphasis omitted; internal quotation marks omitted.)

Similarly, in *Schnier* v. *Ives*, 162 Conn. 171, 177, 293 A.2d 1 (1972), this court rejected the Highway Commissioner's claim that a state referee had adopted an improper method of valuing a property by refusing to consider the price at which the plaintiff had purchased it six months prior to the taking as "the best evidence of its value on the day of taking and in completely disregarding and overlooking the significance of this sale which preceded the condemnation date by six months." This court observed that, although the referee had properly admitted the recent purchase price into

evidence, "[h]e did not, however, employ it in any method used by him to determine valuation. He was not required to do this, since the trier arrives at his own conclusion as to the value of land by weighing the opinion of the appraisers, the claims of the parties in the light of all the circumstances in evidence bearing on value and his own general knowledge of the elements going to establish value . . . ."[11] Id., 177–78. In my view, the majority's decision to reverse the decision of the trial court on the ground that it declined to apply the discounted cash flow income approach—despite giving ample reasons grounded in the record of the present case for that decision—is a major sea change in our state's case law affording our trial courts the discretion to select the appropriate valuation method when making the intensely factual determination of a property's value.

## II

The trial court's discretion in property valuation matters is, however, not absolute. Although I conclude that the trial court did not abuse its discretion in declining to apply the discounted cash flow approach in valuing Wheelabrator's property, I still must consider whether the record factually supports the trial court's valuation of Wheelabrator's property under the reproduction cost approach that it adopted. See footnote 13 of this concurring opinion. "Valuation is a matter of fact to be determined by the trier's independent judgment." (Internal quotation marks omitted.) *Abington, LLC* v. *Avon*, 101 Conn. App. 709, 715, 922 A.2d 1148 (2007). In a "tax appeal taken from the trial court to the Appellate Court or to this court, the question of overvaluation usually is a factual one subject to the clearly erroneous standard of review . . . . Under this deferential standard, [w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Additionally, [i]t is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 100–101.

Having reviewed the record, I agree with Wheelabrator's claim that the trial court improperly included Wheelabrator's personal property in its valuation of the real property. As stated previously, the trial court elected to apply the reproduction cost approach to value Wheelabrator's property, and followed many of the calculations utilized by Pomykacz, the city's appraiser, to arrive at that valuation. Specifically, in crediting the reproduction cost value calculated by Pomykacz, the trial court accepted the historical costs of construction of $241,949,000, declined to credit his proffered developer's profit of 15 percent, and applied his suggested trend factor of 2.08 percent in accordance with the Handy-Whitman index[12] to arrive at a "reproduction cost new" valuation of $503,253,920. The trial court then decreased that value by 38 percent for depreciation in accordance with Pomykacz' estimation to arrive at a present value, as of October 1, 2008, of $312,017,430, and added back the stipulated land value of $2 million to arrive at a total real property value of $314,017,430. The trial court stated in a footnote that this value did not "include personal property since the cost valuation is not based upon the valuation of a going concern."

Notwithstanding this footnote in the memorandum of decision, I am left with a "definite and firm conviction" that the trial court committed a mistake in its reproduction cost calculations. See *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 101. As the trial court stated in its memorandum of decision, with respect to the 2011 tax appeal, it is undisputed that the value of Wheelabrator's personal property was $56,873,060. Although the cost approach, as described in Pomykacz' report, requires an adjustment for the value of personal property, his report does not indicate where that adjustment was made, and the trial court's memorandum of decision follows suit, insofar as the sole basis stated by the trial court for discounting Pomykacz' reproduction cost value was the exclusion of a developer's profit. Indeed, consistent with his report, Pomykacz testified that his overall valuation of the entire property of $357,500,000 did not distinguish between real and personal property. This failure to account for more than $56 million in personal property, in accordance with Pomykacz' own stated approach, leads me to conclude that the trial court's calculation of the real property's value was clearly erroneous. Accordingly, I agree with the majority that a new trial is required, at which the trial court "must determine whether the experts' appraisals of the property include the value of the personal property and allocate the taxes on the real and personal property accordingly."[13]

I, therefore, concur in the judgment.

[1] Consistent with the majority opinion, all references to Wheelabrator within this opinion include the other plaintiffs in the present case, namely, United States Bank National Association, James E. Mogavero, and Waste

To Energy I, LLC. See footnote 2 of the majority opinion.

[2] By way of background, I note that discounted cash flow "is an accepted method for determining the present value of real property" under the income capitalization approach to valuation. (Internal quotation marks omitted.) *Heather Lyn Ltd. Partnership* v. *Griswold*, 38 Conn. App. 158, 162, 659 A.2d 740 (1995); see also *Newbury Commons Ltd. Partnership* v. *Stamford*, 226 Conn. 92, 100, 626 A.2d 1292 (1993); Appraisal Institute, The Appraisal of Real Estate (10th Ed. 1992) pp. 420–21; Dictionary of Real Estate Appraisal (1984) p. 94. " 'The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value.' Appraisal Institute, [supra] p. 409." *Heather Lyn Ltd. Partnership* v. *Griswold*, supra, 162–63.

[3] Although not dispositive to my analysis, I respectfully disagree with the majority's reliance on principles governing the interpretation of judgments as written instruments. See, e.g., *Ottiano* v. *Shetucket Plumbing Supply Co.*, 61 Conn. App. 648, 652, 767 A.2d 128 (2001). In my view, these principles are inapplicable because this is not a case wherein we are trying to determine whether a trial court properly enforced or implemented the terms of a previously rendered court order. See, e.g., *Sosin* v. *Sosin*, 300 Conn. 205, 217–20, 14 A.3d 307 (2011) (whether trial court's order was improper modification of prior judgment of dissolution); *State* v. *Denya*, 294 Conn. 516, 531–34, 986 A.2d 260 (2010) (whether trial court's probation order gave office of adult probation discretion to discontinue electronic monitoring of defendant). In my view, what matters, as in any direct appeal challenging the decision of a lower court, is the nature of the ruling under review, not the subjective intent of the tribunal.

[4] In contrast to an income capitalization approach that "values property on the basis of the property's income producing potential," the "going concern approach, by comparison, is not a method of valuing real estate, but a method of valuing a going concern, which may include real estate as one of its components. . . . [T]he value of a going concern is comprised of (1) real property, (2) tangible personal property (furniture, fixtures, equipment and inventory), and (3) intangible personal property, which includes residual intangibles. . . . Simply put, the calculation necessarily involve[s] an allocation among the component parts of real property and tangible and intangible [personal property]. . . . Included in the residual intangible category is capitalized economic profit, or business enterprise value, which is defined as the present worth of an entrepreneur's economic (pure) profit expectation. . . . In determining the value of a going concern, an acceptable method of calculation is to apply an income capitalization approach to the income stream of the business. . . . In the income capitalization approach [for valuing a going concern], because the capitalized income stream will most likely reflect income to [the going concern], all components of net operating income not attributable to the real estate must be removed. The difficulty of these assignments does not relieve the appraiser of the responsibility to treat the tangible and intangible [personal] property. Not to do so produces either use value or the value of [the going concern]; neither is the market value of the fee simple estate in real property. . . . Thus, although both real property and going concerns can be valued on the basis of their income producing potential, the method for doing so, and the resulting valuations, are not equivalent. Specifically, when a going concern is valued under the income approach, that value pertains to the market value of the total assets of the business, of which real property is but one component. In order to determine the value of the real estate associated with that going concern, the values of the other components of the total assets of the business must be subtracted from the overall value." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Redding Life Care*, *LLC* v. *Redding*, supra, 308 Conn. 95–96 n.9, citing Appraisal Institute, The Appraisal of Real Estate (12th Ed. 2001) pp. 641–44.

[5] In particular, we noted that the trial court "specifically questioned the percentage by which [the appraiser] depreciated [the care facility's] furniture, fixtures and equipment, the simplistic formula [he] used to calculate business value, and [his] failure to recognize [the care facility's] state of operation when it first opened. The trial court also rejected [the appraiser's] unsupported valuation of intangibles. Any one of these flaws would have constituted sufficient grounds for the trial court to have rejected [the appraiser's] appraisal method as unpersuasive. Simply put, the trial court rejected [the appraiser's] appraisal as not credible because it was premised on formu-

las and calculations that failed to value [the care facility] accurately." (Footnote omitted.) *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 103–104.

[6] To this end, I disagree with Wheelabrator's reliance on numerous decisions in other tax appeals demonstrating that the trial court in the present case, *Hon. Arnold W. Aronson*, judge trial referee, "has repeatedly and consistently rejected the [discounted cash flow] income approach as a method of valuing real estate," including when "both [parties'] litigation appraisers testified it was the most appropriate method to value the property at issue." See, e.g., *Dominion Nuclear* v. *Waterford*, Superior Court, judicial district of New London, Docket No. CV-03-0566126-S (November 8, 2007) (valuation of nuclear power plant). Because we are solely concerned with the trial court's decision in *the present* case, I decline Wheelabrator's invitation to use these other decisions as, in essence, habit evidence of some kind of generalized antipathy, harbored by the trial court, toward the discounted cash flow approach.

[7] The trial court issued this articulation in response to an order from this court granting in part the city's motion for review of the trial court's denial of the city's motion for an articulation on this point. See Practice Book §§ 66-5 and 66-7.

[8] I acknowledge that, in footnote 22 of its memorandum of decision, the trial court quoted a New Jersey Tax Court case for the colorfully stated proposition that "the courts have not always discussed the discounted cash flow analysis . . . as a method for arriving at true market value for real estate in the most positive terms," and had described the discounted cash flow "method, as applied to tax valuation proceedings, [as] an amalgam of interdependent, attenuated assumptions of limited probative value. *Whatever may be its utility in other contexts, its use in this case can only be described as an exercise in financial haruspication.*" (Emphasis added; internal quotation marks omitted.) *Tamburelli Properties Assn.* v. *Cresskill*, 15 N.J. Tax 629, 643 (1996), aff'd, 308 N.J. Super. 326, 705 A.2d 1270 (App. Div. 1998), citing *University Plaza Realty Corp.* v. *Hackensack*, 12 N.J. Tax 354, 368 (1992), aff'd, 264 N.J. Super. 353, 624 A.2d 1000 (App. Div. 1993). I do not view these quotations from trial level courts in a sister state as warranting a conclusion that the trial court in the present case rejected the discounted cash flow method as a matter of law. Instead, I view this footnote as nothing more than a tangent that must be considered in the context of the trial court's thorough analysis of the reports and testimony of the appraisers *in the present case*. Indeed, had the trial court intended to bar the use of discounted cash flow as a matter of law, it surely would not have cited *Tamburelli Properties Assn.*, which went on to state that "the reservations of the court in using the [discounted cash flow] method in prior cases are not warranted in this instance. [The trial court's] decision in *University Plaza Realty Corp.* was based on specific facts and circumstances that do not exist here." *Tamburelli Properties Assn.* v. *Cresskill*, supra, 643.

[9] The trial court rejected the use of the replacement cost approach because it deemed the reproduction cost approach to be more reflective of the property as it actually existed on the valuation date, rather than "that of a newly constructed modern facility which did not exist" and that reflects a "purchaser's potential future use," rather than "the current use of the subject property . . . ."

[10] For early statements of this venerable rule, see, for example, *Moss* v. *New Haven Redevelopment Agency*, 146 Conn. 421, 425–26, 151 A.2d 693 (1959), and *Appeal of Cohen*, 117 Conn. 75, 85–86, 166 A. 747 (1933).

[11] Other examples of the trial court's discretion in this regard abound. See, e.g., *Aetna Life Ins. Co.* v. *Middletown*, supra, 77 Conn. App. 33–34 (concluding that trial court properly gave "serious consideration" to "several methods" of rental property valuation enumerated in § 12-63b, before choosing "the cost approach as the best method for valuing the subject property" and noting that trial court "gave ample consideration to the replacement cost approach but, ultimately, given the particular circumstances presented . . . chose to adopt reproduction cost as the fairest and most accurate method of determining the subject property's value under the cost approach"); see also *Greenfield Development Co. of Fairfield* v. *Wood*, supra, 172 Conn. 450–51 (trial court did not abuse discretion by valuing entire property at its highest and best use, rather than following appraisal that broke land into differently valued parcels based on their "degrees of wetness, elevation and terrain"); *Connecticut Printers, Inc.* v. *Redevelopment Agency*, 159 Conn. 407, 413–14, 270 A.2d 549 (1970) (rejecting property owner's claims that trial court improperly rejected "appropriate" reproduction cost approach for valuing its building "because of a failure to understand the

method" and that trial court "was required, as a matter of law, to apply the reproduction less depreciation method of valuation to property devoted to a special commercial use," given his own expert's testimony that " 'the income approach is the reflection of the value of the property' ").

[12] Pomykacz' report states that the Handy-Whitman trend index is "[t]he most commonly accepted and widely acknowledged trend index within the electric utility industry" for estimation of the reproduction cost new. The Handy-Whitman index provides "index numbers for various construction, material, and labor costs of building, electric utility, and gas utility construction for six different regions in the [United States] from 1912 to present," accounting for factors such as changes in material costs and the value of the dollar. These indices are applied "[to trend] forward the original historical cost to calculate the [r]eproduction [c]ost [n]ew . . . ."

[13] I note that, in part III of its opinion, the majority acknowledges, but need not decide this issue given that it ordered a new trial in accordance with part II of its opinion. I further note that I agree with the majority's thoughtful resolution of the issues in parts IV, VI, and VII of its opinion with respect to guidance for issues that may arise on remand.

———————————————